(No. 33289.—

SUPERIOR COAL COMPANY, Appellant, *vs.* THE DEPARTMENT OF REVENUE, Appellee.

*Opinion filed December 20, 1954.*

Nelson Trottman, and Gerald M. Chapman, (Nye F. Morehouse, Lowell Hastings, and Drennan J. Slater, of counsel,) all of Chicago, for appellant.

Latham Castle, Attorney General, of Springfield, (William C. Wines, Raymond S. Sarnow, A. Zola Groves, and Richard L. Cooper, of counsel,) for appellee.

Fyffe & Clarke, and Essington, McKibbin, Beebe & Pratt, both of Chicago, (Hamilton K. Beebe, and John Harrington, of counsel,) *amici curiae*.

Per Curiam: The appellant, hereinafter referred to as plaintiff, prosecutes this appeal from a judgment of the circuit court of Cook County, affirming a final assessment under the provisions of the Retailers' Occupation Tax Act, which assessment was made by the Department of Revenue of the State of Illinois, defendant-appellee herein, and hereinafter referred to as the Department. Said assessment is for the period from July 1, 1948, through July 31, 1951, and is for $253,305.76 plus a penalty of $25,330.78.

This was a deficiency assessment based upon certain sales of coal by the plaintiff to the Chicago and North Western Railway Company, hereinafter referred to as the railroad. The Department contends that the receipts from these sales should be included in the sales and gross receipts of the plaintiff notwithstanding the fact that the coal was destined to out-of-State points. The plaintiff

asserts that the sales are within the interstate commerce exception contained in section 2 of the Retailers' Occupation Tax Act and are therefore not taxable.

The review action in the circuit court, pursuant to the provisions of the Administrative Review Act (Ill. Rev. Stat. 1951, chap. 110, par. 264 *et seq.*) resulted in an affirmance of the assessment and judgment thereon. Revenue being involved, an appeal lies directly to this court.

The essential facts necessary to a determination of this controversy indicate that the plaintiff is a wholly owned subsidiary of the railroad. In 1930 plaintiff and the railroad entered into a contract, by the terms of which plaintiff agreed to sell and the railroad agreed to buy coal at certain prices, f.o.b. cars of the railroad on its tracks at the mine.

In 1932, certain amendments were made to the contract, but the evidence indicates that by mutual agreement the parties have rescinded these amendments, and during the tax years here involved were operating under the terms of the 1930 contract.

Under the terms of the agreement the railroad ordered coal on written orders issued from its Chicago offices directed to the plaintiff, requesting that the coal thus ordered be loaded. The coal was to be loaded and marked for specific destinations both in and out of the State of Illinois. The evidence in this case is that when the coal was loaded, memorandum manifests were made up by an employee of the plaintiff and handed to an employee of the railroad. These memorandum manifests moved with the coal from the mine to the weigh office at Benld, Illinois. There an employee of the railroad made up a manifest showing all of the information contained on the memorandum manifest plus the gross weight.

After preparation of the manifest the railroad company on its own behalf prepared a waybill—a document giving a history of the movement of the freight. Two forms of

waybills appear in the record. One, used during the earlier part of the tax period, was that of a waybill for company freight, and later the form used was the same as that employed by the railroad for ordinary commercial shipments.

The directive ordering the change in the form of waybill used provided that "shipments of company coal destined to stations outside of the State of Illinois will be waybilled, * * * on regular commercial waybills, * * *." This directive was dated March 8, 1950. The evidence is that thereafter the commercial form of waybill was, in fact, used.

The railroad did not pay freight charges on this coal to itself. On commercial waybills, the freight and other incidental charges are noted. This is apparently only a bookkeeping transaction. Under company billing it appears that not even bookkeeping entries were made since the applicable regulations of the Interstate Commerce Commission prohibit freight charges for company material being shown as an item of revenue or the inclusion of such charges in its costs of material.

The vast majority of coal billed for out-of-State shipment was actually delivered to its billed destination and used as intended. There are, however, some instances in which diversions from the destination were made. This appears to have been done by the plaintiff pursuant to a prior request received from the railroad. In at least one instance, the railroad, acting on its own authority without a prior request or notice to plaintiff, diverted a shipment.

Cars of freight, including coal, may be diverted from their original destinations while in transit under appropriate tariffs. The one applicable to these shipments provided for diversions by either the shipper or the consignee upon certain conditions not here material.

The facts of these sales, as above outlined, are the basis for the contention by the plaintiff that the sale of coal destined for out-of-State delivery is not subject to the

Retailers' Occupation Tax Act. It asserts that such sales fall within the exception applicable to interstate business reading: "However, such tax is not imposed upon the privilege of engaging in any business in interstate commerce or otherwise, which business may not under the Constitution and statutes of the United States be made the subject of taxation by this State."

The Department argues that these transactions are not within said exception, that the tax in question is not a tax upon the sale but upon the occupation of selling at retail, and that here the entire sales transaction takes place within the State of Illinois. It is further asserted by the Department that the case of *Superior Coal Co.* v. *Department of Finance,* 377 Ill. 282, is determinative of the issues in the present case.

In that case the taxability of certain sales of coal by this plaintiff to the railroad was also in dispute. Plaintiff there asserted that since it was a wholly owned subsidiary of the railroad it should not be subject to the tax, for the two corporations were in fact so integrated that the transactions were not a sale within the meaning of the Retailers' Occupation Tax Act. We there held that the facts and circumstances did not warrant the disregarding of the fiction of the corporate entity. We also passed on the contention of plaintiff that the sales fell within the interstate commerce exemption, and, on the facts of that case, held the exemption to be inapplicable.

Plaintiff places great reliance upon the case of *Nudelman* v. *Globe Varnish Company,* 114 Fed. 2d 916, in which the Circuit Court of Appeals for the Seventh Circuit held the Retailers' Occupation Tax Act not to be applicable. In that case an Illinois seller sold paint to a railroad, f.o.b. Chicago, Illinois, under an order specifying delivery in Milwaukee, Wisconsin. The paint was to be shipped *via* the purchasing railroad under a bill of lading naming the railroad as consignee and Milwaukee, Wisconsin, as the

destination. The court found that "the shipment was handled precisely as it would have been handled had the consignee been a purchaser other than the railroad." The court said that the railroad could and was acting in two different capacities—purchaser and common carrier. The only distinction between the railroad's handling of the shipment of the paint in that case and any other commercial transaction related to the matter of freight charges.

In the case of *Department of Treasury* v. *Wood Preserving Corp.* 313 U.S. 62, on facts analogous to both the *Globe Varnish case* and the first *Superior Coal Company case*, the Supreme Court of the United States held a transaction involving the sale of railroad ties taxable. In that case, however, there was evidence that an agent of the railroad inspected the ties in Indiana, although delivery was accepted by the purchasing railroad at the out-of-State destination.

The courts of California have likewise had occasion to pass upon the question of whether or not sales by a domestic seller to a railroad purchaser and common carrier for itself partakes of interstate commerce so as to relieve the seller from the burdens of State taxation in *Standard Oil Co.* v. *Johnson,* 92 Pac. 2d 470, 132 Pac. 2d 910, 135 Pac. 2d 638, and 147 Pac. 2d 577. The decision found at 132 Pac. 2d 910 came after the decision of the Supreme Court of the United States in the *Wood Preserving case,* and the California court there held that the sale of the commodity (in that case it was oil,) was taxable by California as a local transaction. They refused to follow the *Globe Varnish case,* and, indeed, characterized it as unsound in view of the *Wood Preserving case.* The final case in the California series, found in 147 Pac. 2d 577, was a decision made by the Supreme Court of California after substantial amendments in the contract for sale. The contract there under consideration, as amended, provided for delivery of the oil outside of California, and the goods

were delivered to the railroad as carrier and consignee, freight prepaid f.o.b. destination, and title did not pass until delivery was made outside the State of California. The court, on the basis of those facts, held the sale to be in interstate commerce and therefore not taxable by the State of California.

We have often stated that the Illinois Retailers' Occupation Tax Act imposes an occupation tax upon persons engaged in the business of selling tangible personal property at retail in this State and that the tax is not a tax upon sales, although the tax is measured by the gross receipts from such sales. *Department of Revenue* v. *Jennison-Wright Corp.* 393 Ill 401, and cases therein cited.

Further, it is well established that a State tax, whether a true sales tax or an occupational tax, that discriminates against interstate commerce violates the commerce clause of the Federal constitution. It is not every tax that has some effect upon commerce between the States that is prohibited, but rather it is a tax which falls upon interstate commerce and causes it to be operated at a disadvantage as compared to, or in competition with, intrastate commerce. As stated by the Supreme Court of the United States in *McGoldrick* v. *Berwind-White Coal Mining Co.* 309 U.S. 33: "It was not the purpose of the commerce clause to relieve those engaged in interstate commerce of their just share of state tax burdens, merely because an incidental or consequential effect of the tax is an increase in the cost of doing business. * * * Not all state taxation is to be condemned because, in some manner, it has an effect upon commerce between the states, and there are many forms of tax whose burdens, when distributed through the play of economic forces, affect interstate commerce, which nevertheless falls short of the regulation of the commerce which the constitution leaves to congress."

Thus, it would appear to us that even if the evidence in this case clearly established that the title to the purchased

coal did not pass until such time as the coal reached its destination, it is nonetheless conceivable that a taxing statute could be devised to tax the transaction when most, if not all, of the aspects of the occupation of selling coal at retail transpire in the State of Illinois. We need not pass upon this point as a matter of law in this case, however, for in our view of the facts of this case, the first *Superior Coal Company case* is controlling and is determinative of the interstate commerce contention raised. In disposing of the interstate commerce exemption contention of the plaintiff, we said at page 296: "It is undisputed that all of the coal sold by the plaintiff to the railway company is loaded into the latter's cars on its tracks at its mines near Gillespie. The railway company, it thus appears, obtains complete possession of the coal in its cars in Illinois at the mines. It is immaterial that coal mined and delivered to the railway company in this State was intended for use beyond the territorial boundaries of Illinois. Here, the fact that a portion of the coal delivered to the railway company used in other States is of no greater significance within the contemplation of the Retailers' Occupation Tax Act, than the fact that wearing apparel purchased in Illinois may later be worn in Florida or California * * * The railway company was vested with complete domination of the coal when it is placed on its cars at plaintiff's mines and the successive sales, without question, were consummated in Illinois. Section 2 of the Retailers' Occupation Tax Act, it follows necessarily, is not a bar to the challenged tax."

While the evidence indicates that there are some factual distinctions between the first *Superior Coal Company case* and this case, such distinctions are not sufficient so as to change the legal consequences of the actions by and between the parties from a transaction wholly intrastate to one that is clothed with the immunity of an interstate transaction. Indeed, as to certain phases of the evidence

in the first case, aside from the contract, there was no evidence as to the intention of the parties with regard to the acquisition of title to the coal. The same is true of the present case except for evidence of conversations by and between the officers of the parent and its subsidiary corporation, in which conversations we are asked to believe they concluded that the coal shipped by the Superior Coal Company did not become the property of the carrier-purchaser railroad until its arrival at its destination. The present record also affirmatively shows that in at least one instance the railroad company acting as carrier exercised complete domination, amounting to ownership, over the coal and diverted the coal in accordance with its own wishes and desires without prior consultation with the shipper plaintiff, notwithstanding the present assertion that the railroad company had no such ownership. Upon a careful review of the facts as shown by the record in this case, we must come to the inescapable conclusion that once the coal was loaded into the cars of the railroad at the mine in Illinois, the coal then and there became, for all practical purposes, the property of the railroad, and the subsequent paper transactions by and between the parties was ineffective to carry out the fictional assertion that the railroad, though it was in possession of the property, was, in fact, in possession of the property as a carrier and not as a purchaser.

The very able briefs filed by all parties in this proceeding raise many other points and urge other propositions of law. In our review of the facts, however, this case is controlled by the first *Superior Coal Company case,* and it becomes unnecessary to decide the remaining issues presented other than to comment upon the contention by the plaintiff that the Department of Revenue as defendant herein had, by its rules and regulations, for some time acquiesced in a construction of the Illinois Retailers' Occupation Tax Act identical with the position of the plaintiff

in this proceeding. The plaintiff therefore contends that the Department is by its own rules and regulations estopped from making a contrary assertion.

The rules and regulations of the Department and its contemporaneous construction of the statute, if erroneous, are, of course, not binding upon this court, and an erroneous construction of a statute by an administrative agency will not be followed. *Winakor* v. *Annunzio,* 409 Ill. 236.

The doctrine of collateral estoppel or of contemporaneous construction cannot be urged against the State of Illinois in the case in which a rule-making or administrative agency of the State, acting under a misapprehension as to the interpretation to be given the law, makes and follows to some extent erroneous rules and regulations. The rules and regulation of the Department, therefore, that are in conflict with this decision and with the provisions of the law cannot operate to abrogate any of the rights of the State in this proceeding.

For the reasons stated, the judgment of the circuit court of Cook County is affirmed.

*Judgment affirmed.*