(No. 54753.—

ILLINOIS BELL TELEPHONE COMPANY, Appellee, v. ROBERT H. ALLPHIN, Director of Revenue, *et al.*, Appellants.

*Opinion filed December 17, 1982.*

CLARK, J., took no part.

GOLDENHERSH, J., specially concurring.

Tyrone C. Fahner and William J. Scott, Attorneys General, of Springfield, and Dore & Clark, Ltd., Special Assistant Attorneys General, of Chicago (Cornelius F. Dore, William G. Clark, Jr., and Ilene M. Davidson, of counsel), for appellant.

James W. Kissel, Henry L. Mason III, and David W. Carpenter, of Sidley & Austin, of Chicago, and James R. Bryant, Jr. (Howard J. Trienens, Robert D. Allen, and

Thomas P. Hester, of counsel), for appellee.

Robert A. Helman, Stephen J. Mattson, and Martin G. Rosenstein (Mayer, Brown & Platt, of Chicago, of counsel), for *amicus curiae* the Illinois Telephone Association.

JUSTICE SIMON delivered the opinion of the court:

By this action filed in 1973 in the circuit court of Cook County plaintiff, Illinois Bell Telephone Company (Bell), seeks to have certain of its revenues declared exempt from the Illinois messages tax (Ill. Rev. Stat. 1979, ch. 120, par. 467.1 *et seq.*) and to enjoin the defendant, the Department of Revenue (the Department), from collecting the taxes at issue. The Department moved to dismiss on the ground Bell had failed to exhaust its administrative remedy, and this motion was denied by the circuit court. This court, after allowing a direct appeal under its Rule 302(b) (73 Ill. 2d R. 302(b)), affirmed the circuit court. *Illinois Bell Telephone Co. v. Allphin* (1975), 60 Ill. 2d 350.

The parties then went to trial in 1979 on two issues: (1) Did the Messages Tax Act apply during the period in dispute (1967 to 1973) to revenues Bell received from its participation in the transmission of messages which originate or terminate outside this State (interstate messages); and (2) Does Bell owe the messages tax on revenues paid to and retained by other telephone companies for their participation in the transmission of intrastate toll messages pursuant to contracts with Bell and on which the other companies themselves pay a message tax.

On the first issue, the circuit court concluded that the messages tax applied to Bell's interstate revenue during the period in dispute, and that Bell owed the State $115,150,855 for this period for back taxes, penalties and interest. On the second issue, which involved ap-

proximately $13,160,000 in claimed taxes, the circuit court held in favor of Bell, concluding that payments Bell made or credits it allowed to other telephone companies pursuant to traffic agreements approved by the Illinois Commerce Commission were proper deductions from the Bell revenues subject to the tax. The appellate court reversed the judgment for back taxes, penalties and interest on interstate messages and affirmed the circuit court's holding that Bell was not obligated to pay a messages tax on the amounts paid or credited to other telephone companies on intrastate calls. (95 Ill. App. 3d 115.) We allowed the Department's petition to appeal to this court.

INTERSTATE REVENUES

The appellate court gave three reasons for reversing the circuit court on this aspect of the case. First, the language and history of the statute do not permit a construction which includes interstate messages within the scope of the authorized tax. Second, even if the statute permitted taxation of interstate revenues, the Department is bound by the written regulations it promulgated and the tax forms it disseminated, and imposition of the tax retroactively would be contrary to those regulations and forms. Finally, if the statute were to be applied in the manner the Department contends it should be, the statute would be vague and uncertain and thus violative of due process requirements. We affirm the appellate court because we believe the language and history of the statute make it inapplicable to interstate revenues. This makes it unnecessary to consider the two additional grounds on which the appellate court relied.

In taxing the transmission of messages, the State may exclude interstate revenues and apply the tax only to revenues from messages which begin and end in this State. (*Adler v. Illinois Bell Telephone Co.* (1978), 72 Ill. 2d 295.) The wording of the taxing statute, the law in ef-

fect when it was passed controlling a State's authority to tax interstate messages, the statute's relationship to its predecessor and companion statutes, the Department's own interpretation of the statute, and the fact that the statute was subsequently amended with no change in the portion directly involved in this dispute indicate that the legislature intended to impose that kind of tax.

The portion of the Messages Tax Act which we are called upon to construe and apply is section 2. It provides:

> "A tax is imposed upon persons engaged in the business of transmitting messages *in this State* at the rate of three per cent (3 %) of the gross receipts *from such business* \*\*\*. However, such tax is not imposed upon the privilege of engaging in any business in interstate commerce or otherwise to the extent to which such business may not, under the Constitution and statutes of the United States, be made the subject of taxation by this State." (Emphasis added.) Ill. Rev. Stat. 1945, ch. 120, par. 467.2.

Two occupation taxes on transmission of messages in Illinois were adopted before the present statute. The first was a part of the Public Utility Tax Act enacted in 1935 (Ill. Rev. Stat. 1935, ch. 120, par. 440 *et seq.*). The second was included in the public utilities revenue act passed in 1937 (Ill. Rev. Stat. 1937, ch. 120, par. 468 *et seq.*). These statutes, in the words of the 1937 act, covered the gross receipts of "persons engaged in the business of transmitting telegraph or telephone messages or of distributing, supplying, furnishing or selling gas or electricity to persons for use or consumption and not for resale \*\*\*." (Ill. Rev. Stat. 1937, ch. 120, par. 469.) Both statutes provided that the "taxes are not imposed with respect to any transaction in interstate commerce, or otherwise, which transaction may not, under the constitution and statutes of the United States, be made the subject of taxation by this State." Ill.

Rev. Stat. 1935, ch. 120, par. 441; Ill. Rev. Stat. 1937, ch. 120, par. 469.

At the time of these taxing measures, *New Jersey Bell Telephone Co. v. State Board of Taxes & Assessment* (1930), 280 U.S. 338, 74 L. Ed. 463, 50 S. Ct. 111, represented the prevailing law. That decision announced that although a State might tax property used to carry on interstate commerce, it could not tax or burden interstate commerce or tax gross earnings derived therefrom or impose "a license fee or other burden upon the occupation or the privilege of carrying on" interstate commerce, whatever may be the means employed to that end. That case prohibited a State from collecting a direct tax on gross receipts from interstate commerce. *Cooney v. Mountain States Telephone & Telegraph Co.* (1935), 294 U.S. 384, 79 L. Ed. 934, 55 S. Ct. 477, followed the same principle, holding that a State tax on telephone instruments used in making both intrastate and interstate calls was a privilege or occupation tax imposed through an indiscriminate application to instrumentalities common to both intrastate and interstate service, and as such the tax was an unconstitutional burden on interstate commerce.

The regulations promulgated by the Department relating to the 1935 and 1937 taxes on messages provided that the tax was not imposed on revenues from the transmission of any message that either "originates" or "terminates" "outside of Illinois." These regulations described such messages as being in interstate commerce and not taxable. They also provided that, where the message originates in Illinois and is transmitted to a second point in Illinois, the transaction is taxable even when a portion of the lines used for the transmission are outside Illinois. It is thus clear that the predecessors of the tax which is involved in this case authorized a tax only with respect to revenues from the transmission of intrastate messages notwithstanding the proviso in those statutes quoted above

stating that taxes were not being imposed on transactions in interstate commerce which may not under the Constitution and statutes of the United States be taxed by Illinois.

The legislature adopted the Messages Tax Act with which we are concerned in this case in 1945. (Ill. Rev. Stat. 1945, ch. 120, par. 467.1 *et seq.*) There is nothing in the history of that statute or in the wording of the statute in comparison with its predecessor statutes adopted in 1935 and 1937 to suggest that the legislature intended to enact a different type of tax in 1945. Moreover, the history of the Messages Tax Act and its wording, as compared with the wording of two other tax acts contemporaneously adopted in 1945, indicate the contrary. In that year the General Assembly divided the public utilities revenue act into three separate taxing statutes—the Messages Tax Act, applying to transmittal of messages, the Gas Revenue Tax Act (Ill. Rev. Stat. 1945, ch. 120, par. 467.16 *et seq.*), applying to the business of selling gas, and the Public Utilities Revenue Act (Ill. Rev. Stat. 1945, ch. 120, par. 468 *et seq.*), taxing the business of selling electricity. When these three statutes were enacted, the law continued to prohibit the taxation of receipts from interstate messages. See *Joseph v. Carter & Weekes Stevedoring Co.* (1947), 330 U.S. 422, 432-34, 91 L. Ed. 993, 1003-04, 67 S. Ct. 815, 821.

The language the legislature used in contemporaneously taxing the transmission of messages, the sale of gas, and the delivery of electricity is significant. The phrase "in this State," as used in section 2 of the Messages Tax Act quoted above, is not found in the Gas Revenue Tax Act at all, while the Act taxing sales of electricity uses the phrase in an entirely different context. The statute relating to the business of selling electricity taxes "persons engaged in this State in the business of" selling electricity. (Ill. Rev. Stat. 1945, ch. 120, par. 469.) The use of the limiting phrase "in this State" in the Messages Tax Act, as compared with its use in the Public Utilities Revenue Act to

modify "persons" and its complete omission from the Gas Revenue Tax Act, demonstrates that the legislature used the phrase in the Messages Tax Act to modify "messages." The use and placement of the phrase "in this State" indicate that it was employed as a limitation upon the area in which such messages must move, that is, "in this State" as compared with wholly or in part outside Illinois.

Turning to the specific language of section 2 of the Messages Tax Act of 1945, we reach the same conclusion. We are not persuaded by the Department's argument that the phrase "in this State" modifies "persons" and has nothing to do with the scope of the tax. The tax applies to the "business of transmitting messages in this State" at a specified percent of the "gross receipts from such business." (Ill. Rev. Stat. 1945, ch. 120, par. 467.2.) The business referred to is transmitting messages in this State. The words "in this State" modify "messages," not "persons," and declare which gross receipts are subject to the tax. Under the last-antecedent rule of statutory construction, which is followed in Illinois (*City of Mount Carmel v. Partee* (1979), 74 Ill. 2d 371, 375), the qualifying phrase "in this State" modifies the immediate preceding word "messages." This supports the conclusion that the Act authorized taxation only on messages which both begin and end in Illinois.

The result we reach also follows from the presumption that the legislature in 1945 intended to enact a valid taxing statute. Statutes are to be interpreted in a manner consistent with "the state of the law existent at the time of their enactment." (*People v. Boreman* (1948), 401 Ill. 566, 571-72.) Adhering to this principle this court in *Adler v. Illinois Bell Telephone Co.* (1978), 72 Ill. 2d 295, 297, construed a city of Chicago message tax adopted when Federal constitutional law barred taxes on interstate revenues as not applicable to such revenues even though the ordinance on its face was not limited to intrastate calls. In

examining section 2 of the Messages Tax Act we conclude
that the General Assembly did not intend to tax interstate
revenues either in 1935, 1937 or 1945 because Federal con-
stitutional law, as construed and applied in judicial deci-
sions, prohibited such taxation at those times. Again we
observe that the terms of the Messages Tax Act expressly
reflected the specific regulations previously applicable to
the 1935 and 1937 acts and were consistent with the Fed-
eral prohibition against burdening interstate commerce
with a direct tax on gross receipts from interstate mes-
sages.

*New Jersey Bell Telephone Co. v. State Board of Taxes
& Assessment* and *Cooney v. Mountain States Telephone &
Telegraph Co.*, both referred to above, held prior to the en-
actment of the 1945 messages tax that a State privilege or
occupation tax on interstate commerce is constitutionally
prohibited. In the latter case the Supreme Court, address-
ing this question, said:

> "There is no question that the State may require pay-
> ment of an occupation tax from one engaged in both in-
> trastate and interstate commerce. But a State cannot tax
> interstate commerce; it cannot lay a tax upon the busi-
> ness which constitutes such commerce or the privilege of
> engaging in it. And the fact that a portion of a business
> is intrastate and therefore taxable does not justify a tax
> either upon the interstate business or upon the whole
> business without discrimination." *Cooney v. Mountain
> States Telephone & Telegraph Co.* (1935), 294 U.S. 384,
> 392-93, 79 L. Ed. 934, 941, 55 S. Ct. 477, 481-82.

Years before the Supreme Court had held that express
companies whose vehicles were used to haul both intrastate
and interstate shipments out of New York City were im-
mune from a city licensing fee. (*Barrett v. City of New
York* (1914), 232 U.S. 14, 58 L. Ed. 483, 34 S. Ct. 203.)
Again in *Freeman v. Hewit* (1946), 329 U.S. 249, 252, 91
L. Ed. 265, 271, 67 S. Ct. 274, 276, in prohibiting an Indi-
ana gross income tax on an Indiana broker, the court ob-

served that the commerce clause "by its own force created an area of trade free from interference by the States." That tax contained a proviso similar to that in section 2 of the Illinois Messages Tax Act excepting from its scope "such gross income as is derived from business conducted in commerce between this state and other states *** to the extent to which *** Indiana is prohibited from taxing such gross income by the Constitution of the United States." 329 U.S. 249, 250, 91 L. Ed. 265, 271, 67 S. Ct. 274, 275-76.

*Spector Motor Service, Inc. v. O'Connor* (1951), 340 U.S. 602, 95 L. Ed. 573, 71 S. Ct. 508, is another authority holding that this principle of constitutional law was still adhered to six years after the messages tax was enacted. Spector was a motor freight line engaged in hauls in interstate commerce. Its trucks went directly to a customer's place of business in Connecticut to pick up full truckloads and then took them directly out of Connecticut. When less than full-truckload shipments were available, Spector's pickup trucks gathered freight from customers and took it to two terminals operated by the company within the State of Connecticut where it was assembled into full truckloads and then transported outside Connecticut. The court held that the pickup trucks merely acted as part of the interstate transportation and observed that there was long-established precedent for keeping interstate commerce free from State taxation on the privilege of doing business. It was not until 1977 when *Spector Motor Service, Inc. v. O'Connor* was overruled by *Complete Auto Transit, Inc. v. Brady* (1977), 430 U.S. 274, 51 L. Ed. 2d 326, 97 S. Ct. 1076, that the rule that a State tax on the privilege of doing business is *per se* unconstitutional when applied to interstate commerce finally collapsed.

The Department argues that *Spector* provided a sanctuary for interstate commerce against a State occupation tax only where the business being taxed did not conduct intra-

state activity as well as interstate activity. Although the carrier which the State of Connecticut sought to tax in *Spector* was not engaged in any intrastate shipments in that State, we find nothing in the opinion to indicate that applying the tax to interstate business would have been more acceptable had the company at the same time been an intrastate carrier in Connecticut. The Supreme Court addressed the subject of whether an occupation tax was more palatable when imposed on both interstate and intrastate commerce than when imposed only on the former in both the portion of *Cooney v. Mountain States Telephone & Telegraph Co.* quoted above and in *Freeman v. Hewit.* In both cases it answered in the negative. In *Freeman v. Hewit* it said:

> "Of course a State is not required to give active advantage to interstate trade. But it cannot aim to control that trade even though it desires to control its own. It cannot justify what amounts to a levy upon the very process of commerce across State lines by pointing to a similar hobble on its local trade. It is true that the existence of a tax on its local commerce detracts from the deterrent effect of a tax on interstate commerce to the extent that it removes the temptation to sell the goods locally. But the fact of such a tax, in any event, puts impediments upon the currents of commerce across the State line, while the aim of the Commerce Clause was precisely to prevent States from exacting toll from those engaged in national commerce." *Freeman v. Hewit* (1946), 329 U.S. 249, 254, 91 L. Ed. 265, 273, 67 S. Ct. 274, 277.

As late as 1959, in *Northwestern States Portland Cement Co. v. Minnesota* (1959), 358 U.S. 450, 458, 3 L. Ed. 2d 421, 427, 79 S. Ct. 357, 362, which initiated the erosion of *Spector* culminating in *Complete Auto Transit,* and which involved a State net income tax on a corporation engaged exclusively in interstate commerce, the court summarized the holding in *Spector* in the following sentence:

> "Moreover, it is beyond dispute that a State may not lay a tax on the 'privilege' of engaging in interstate com-

merce." 358 U.S. 450, 458, 3 L. Ed. 2d 421, 427, 79 S. Ct. 357, 362.

Thus, the law which prevailed at the time the Messages Tax Act was adopted was that a State was prohibited by the commerce clause from imposing an occupation tax on interstate commerce, regardless of whether the enterprise being taxed also engaged in commerce confined to the taxing state.

Our conclusion regarding the scope of the Messages Tax Act is supported by the unchanging interpretation given the statute by the administrative department charged with enforcing it and the fact that while the legislature has amended the statute it has never changed the provisions with which we are now concerned. The regulations adopted by the Department with respect to the 1945 act shortly after its passage were compatible with those relating to the two predecessor acts, and the Department continued to adhere to those regulations for more than two decades. The consistent and contemporaneous construction by those charged with the administration of the Act, a construction which went unchallenged by the legislature, is persuasive in arriving at the proper interpretation to be given the statute. (*Johnson v. Robison* (1974), 415 U.S. 361, 367-68, 39 L. Ed. 2d 389, 398, 94 S. Ct. 1160, 1166; *People ex rel. Watson v. House of Vision* (1974), 59 Ill. 2d 508, 514-15.) The Messages Tax Act has been amended nine times since its passage in 1945, two of these amendments being of section 2, the provision which imposes the tax. But the legislature has never amended the Act to change the manner in which the Department was interpreting and applying it; nor has the legislature changed the statutory terms to which Bell directs our attention. (*American Oil Co. v. Mahin* (1971), 49 Ill. 2d 199, 205-06.) The following observation in *People ex rel. Spiegel v. Lyons* (1953), 1 Ill. 2d 409, 414, is relevant:

"That the statute has remained unaltered through successive sessions of the General Assembly since 1941 [in this

case since 1945] indicates legislative acquiescence in the contemporary and continuous administrative interpretation.''

The Department's principal argument appears to be that the Messages Tax Act of 1945 is a flexible type of statute which taxes interstate service to the extent Federal constitutional law may from time to time permit. The circuit court judge characterized it as a tax in a "state of vacillation." The Department contends that, if the tax is not regarded as opening the door for taxation of interstate as well as intrastate service, the proviso in section 2 that the tax is not imposed on interstate service to the extent to which such service or business is prohibited by the Constitution and statutes of the United States from being taxed by the State of Illinois would be meaningless. We do not believe that to save the messages tax from being meaningless it has to be applied like an accordion stretching in and out with changes in the interpretation of the Constitution so far as the authority to tax interstate service is concerned.

The provision in question is a routine one. Identical language appears in the other two taxing measures enacted in 1945 at the same time as the Messages Tax Act, the Gas Revenue Tax Act (Ill. Rev. Stat. 1945, ch. 120, par. 467.17) and the Public Utilities Revenue Act (Ill. Rev. Stat. 1945, ch. 120, par. 469). It appears in some form generally similar to the Messages Tax Act proviso in several Illinois occupation tax statutes. See the Illinois Service Occupation Tax Act (Ill. Rev. Stat. 1979, ch. 120, par. 439.103), the Retailers' Occupation Tax Act (Ill. Rev. Stat. 1979, ch. 120, par. 441), the Cigarette Tax Act (Ill. Rev. Stat. 1979, ch. 120, par. 453.2), and the Tobacco Products Tax Act (Ill. Rev. Stat. 1977, ch. 120, par. 453.83).

The interpretation we give section 2 does not render the proviso in question meaningless. The proviso saves the statute from invalidity in the event Federal law were held to preclude taxation of some of the intrastate services in-

corporated into the first sentence of section 2. This question might arise, for example, in connection with an intrastate telephone call to place an interstate telegram. The applicable regulations taxed revenues from the telephone call, but a challenge to this tax on the ground the telephone call was an integral part of the interstate telegram might be advanced in view of a holding such as that in *Joseph v. Carter & Weekes Stevedoring Co.* (1947), 330 U.S. 422, 91 L. Ed. 993, 67 S. Ct. 815. The court decided in that case that intrastate stevedoring is so integrally a part of interstate commerce that the revenues of stevedoring companies from loading vessels employed in interstate and foreign commerce are immunized from State taxation.

We do not find the Department's argument that the purview of the tax expands with removal of constitutional limitations on a State's right to tax interstate transactions sound. The scope of a statute is fixed by the conditions which exist and the law which prevails at the time the statute is adopted. This court has observed that "[s]tatutes are to be construed as they were intended to be construed *when they were passed.*" (Emphasis added.) (*People v. Boreman* (1948), 401 Ill. 566, 572; see *People v. Day* (1926), 321 Ill. 552.) Some statutes utilize words that clearly envision that their operation and scope are to change with changes in the underlying law without the need for further approval by the legislature. The Messages Tax Act is not such a statute. It does not expressly provide that changes in the constitutional law by judicial decision or constitutional amendment which authorize the General Assembly to do what it previously was restricted from doing should expand the reach of the statute without further legislative action. On the contrary, as we read the statute, the legislature would then have to decide whether it wished to exercise its expanded authority.

In *Green v. Advance Ross Electronics Corp.* (1981), 86 Ill. 2d 431, we decided that our long-arm statute was not

in a state of vacillation, expanding or contracting such jurisdiction to the extent permitted by cases decided from time to time construing and applying the due process clause in determining when jurisdiction over a nonresident is proper. We held there that our long-arm statute had a fixed meaning without regard to changes in the concepts of due process. Similarly, we believe the Messages Tax Act had a fixed meaning when it was enacted regarding what revenues it taxed, notwithstanding judicial decisions several years later enlarging the authority of a State to tax interstate transactions. The proviso in section 2 does not contemplate an expansion of the scope of the act; it provides merely that the fixed meaning of the act may contract further should it collide with any existing or new constitutional provision, as we have noted. Hence in interpreting the Messages Tax Act we must look to the state of the law concerning a State's authority to tax interstate business at the time the Act was adopted in 1945, not to the law in later years when Federal decisions expanded that authority.

Even if we were less confident that the scope of the Messages Tax Act was limited to intrastate messages in 1945, any doubts that remained would have to be resolved in favor of Bell. This court adhered to this principle in *Oscar L. Paris Co. v. Lyons* (1956), 8 Ill. 2d 590, 598, and reasserted it recently in *Getto v. City of Chicago* (1979), 77 Ill. 2d 346, 359. The teaching of *Oscar L. Paris Co.* was:

"Taxing laws are to be strictly construed and they are not to be extended beyond the clear import of the language used. If there is any doubt in their application they will be construed most strongly against the government and in favor of the taxpayer." *Oscar L. Paris Co. v. Lyons* (1956), 8 Ill. 2d 590, 598.

Finally, the Department argues that irrespective of whether the Messages Tax Act authorized taxation of interstate revenues, Bell has failed to establish that the revenues in dispute are from interstate calls, and thus Bell has

failed as a matter of proof to cloak these revenues with the interstate exemption. The circuit court found to the contrary, and the Department is bound by that finding, especially because it stipulated that the revenues in issue are the amounts which Bell retained from its billing for interstate toll calls.

The Department also argues that Bell has forfeited the interstate exemption because it reports as its interstate revenue the amounts it receives after crediting other phone companies for remuneration to which they are entitled for use of their lines instead of the amounts Bell actually bills its customers for their interstate calls. We find no merit in this argument because the manner in which Bell reports its gross receipts complies fully with the definition of gross receipts in the Act itself as well as with the regulations. There is no point in treating billings as the equivalent of gross receipts because the former would include revenue for use of lines completely outside Illinois which even the Department does not claim is within the scope of the tax. The appellate court offered an example which convincingly demonstrates this point: a call from one point outside Illinois to another point outside Illinois, but billed to a Chicago number. Bell, in that case, would collect from its Chicago subscriber, but would credit the revenue to the phone companies whose lines were actually used in the call. This is not Bell's revenue at all.

The Department also finds fault with the manner in which Bell reported its interstate revenues, contending the method Bell followed could have reduced its tax liability. Bell included on one line the portion of its billings for interstate calls that it retained and then included the same figure in a deduction it made on a lower line of the reporting form. If Bell had handled the reporting in the way the Department now argues it should have—by including all interstate billings on the earlier line and subtracting that figure on the lower line—the bottom line figure would have been

exactly the same. Either method of reporting leaves Bell's intrastate receipts as the amount reported.

Although we regard Bell's method of reporting its revenues as in compliance with both the statute and the regulations, the Department's objections to the manner of reporting are not relevant to the question which confronts us. That question is whether interstate revenues are within the scope of the statute adopted in 1945. Even if Bell failed to report its interstate revenues properly, we do not understand how that would authorize including those amounts within the revenues subject to tax if the statute imposing the tax exempts those amounts from taxation.

With respect to taxation of interstate revenues, the appellate court was right and the circuit court was wrong.

### INTRASTATE REVENUES

This aspect of the appeal involves amounts reflected in Bell's records which are attributable and transmitted to telephone companies other than Bell under division-of-revenue formulas applied to determine the share of toll charges each of two or more telephone companies should receive for transmitting a message over its lines. The toll calls in question are intrastate, originating at one point in Illinois and terminating at another point in this State. The division-of-revenue formulas are negotiated between the telephone companies operating in Illinois and carried out by means of traffic agreements negotiated between the companies which directly interconnect. The traffic agreements are approved by the Illinois Commerce Commission. They provide for the way traffic is to be routed and establish the formulas and procedures for dividing revenues from calls that are transmitted over the facilities of more than one company.

The Department claims that Bell is liable for the messages tax on the total revenues it collects even though a portion of those revenues are credited and paid under the traffic agreements to other telephone companies whose

lines were used in completing the toll calls. The Department views the division of revenue as payments made by Bell to other telephone companies for furnishing their facilities or equipment in completing the calls which are initiated through Bell. Thus, instead of a sharing of revenue between Bell and other telephone companies the Department regards the payments in question as charges for services furnished by other telephone companies to Bell. These payments, according to the Department, are a part of Bell's cost and expenses of doing business and not deductible from the gross receipts of Bell on which the tax is based. Ill. Rev. Stat. 1981, ch. 120, pars. 467.1, 467.2.

Bell, on the other hand, takes the position that the messages tax is payable, as Bell has paid the tax over the years, only on the portion of revenues it retains after settling up with the other telephone companies for the share of revenues to which they are entitled for transmitting toll calls over their lines. Bell points out that it neither leases nor rents the equipment and facilities of the other telephone companies, and the other companies neither work for it nor are a part of Bell. In fact, the Public Utilities Act requires the other telephone companies in Illinois to own, operate and equip the telephone facilities within the areas they serve, and no telephone company is permitted to acquire a lease on or own, operate or control any aspect of the business of another company or transact any business in the area the other company services without express approval from the Commission. (Ill. Rev. Stat. 1981, ch. 111²/₃, par. 27(b).) In addition the traffic agreements involving Bell which the Illinois Commerce Commission has approved provide that the other telephone companies will equip, own, operate, and control their own systems.

There are approximately 57 telephone companies (sometimes referred to herein as the independent companies) operating in Illinois, each serving a different area. Unlike Bell, the independent companies are relatively small entit-

ies. The systems of all the telephone companies in Illinois are directly or indirectly interconnected so that a call may be placed from one phone to another within the State even though each phone is served by a different company. Each telephone company is authorized by the Illinois Commerce Commission to use its separately owned, operated and maintained facilities and equipment to provide an integrated telephone service to the public, not to Bell; in other words the facilities and equipment of each telephone company provide a link in a statewide system available to serve the public.

The traffic agreements referred to above place on each company the responsibility for collecting all charges owing by its subscribers and customers, including charges for credit card calls. They also give each company responsibility for accounting for and making payments to the other companies for their share of the charges. At the same time, the traffic agreements assign to Bell administrative functions in carrying out the division of revenues between approximately three-quarters of the telephone companies in Illinois with which it interconnects and between itself and those companies.

As part of its administrative function Bell disseminates monthly statements showing the share of toll revenues each of the independents with which it connects is to receive. These statements are calculated under the applicable formula on the basis of data the other telephone companies have furnished Bell; this data consists of each company's total amount of toll billings and in some instances the total number of toll calls it handled.

After the settlement figures are computed, sufficient funds are transferred between the companies to give each company the share of the revenues billed to which it is entitled. At the time of collection, each company enters the amount it collects from its customers for toll services in its revenue account. These accounts are then adjusted when

funds are transferred between the companies to reflect the proper and final division of revenues.

It was after this legislatively sanctioned arrangement for cooperation and sharing of revenues between the many telephone companies in Illinois was already in place that the Messages Tax Act was adopted. Section 1 of the Act (Ill. Rev. Stat. 1981, ch. 120, par. 467.1) defines gross receipts as "the consideration received for the transmission of messages and for all services rendered in connection therewith *** without any deduction on account of the cost of transmitting such messages, the cost of materials used, labor or service costs or any other expense ***." The same section of the Act, in defining "transmission of messages," includes the furnishing of services or facilities connected with the sending of messages but only if the recipient "do[es] not, in turn, receive any consideration in connection therewith." Ill. Rev. Stat. 1981, ch. 120, par. 467.1.

The provisions of the Act, as we read them, demonstrate that the legislature intended to impose a tax on the total amount billed consumers for toll calls in this State by taxing each telephone company only upon its share of the total revenues collected. Only funds which are received as a company's consideration for the "furnishing of services or facilities" are taxable to that company. The Department's Messages Tax Act regulations are even more explicit on this subject. They have provided since the first Messages Tax Act was enacted in 1935 that the tax is only upon amounts received and retained by a company as its consideration for its part in the transmission of messages:

> "[W]here a message is transmitted over the lines of more than one telephone or telegraph company *** the gross receipts of each telephone or telegraph company *** are that portion *of the total messages charge received and retained by each such company as its consideration for its part of such transmission.*" (Emphasis added.) (Illinois Department of Revenue, Rules and Regulations Relating to the Messages Tax Act, art. 10(B).)

This regulation recognizes that individual phone companies will receive only a portion of the total messages charge.

We conclude that where more than one telephone company is engaged in the transmission of a message, the amounts any company receives from the billing company or from Bell pursuant to their traffic agreement is not a cost or expense of doing business of either the billing company or Bell. The amount collected by the billing company or Bell does not represent "consideration received" as that term is used in section 1 of the Messages Tax Act (Ill. Rev. Stat. 1981, ch. 120, par. 467.1). On the contrary, these amounts are gross receipts of the telephone company whose facilities have contributed to completion of the call for its part in such transmission. Under article 10(B) of the Department's messages tax regulations these are gross receipts taxable to the participating company which receives them rather than to the billing company or Bell, which, as the case may be, may collect them or temporarily hold them. Under the division-of-revenues concept, the telephone companies act as collection agents for each other in the functioning of an integrated, interconnected, statewide telephone network, not as independent contractors furnishing services to each other and charging compensation for those services. (*Phillips v. Illinois Bell Telephone Co.* (1966), 34 Ill. 2d 234.) Viewing the relationship between the telephone companies as we do, it follows that the Messages Tax Act imposes the tax on the portion of the billings each company receives and retains under the division-of-revenue formula.

When an independent telephone company's service and facilities are utilized in transmitting a message, it is satisfying its statutory obligation to the public, and it is to the public rather than to Bell or any other telephone company that its services and facilities are being provided. Those companies, rather than Bell, are the providers of telephone service in the regions in which Bell is obliged to route calls

through their facilities. The costs and expenses of participating telephone companies are their costs and expenses, not those of Bell, and their costs and expenses are paid for by telephone users, not by Bell. By the same token, Bell does not pay other telephone companies for using their facilities; it simply performs the administrative function of calculating how much of the total charge they are entitled to have for the use of their own facilities by the public. We know of no occupational tax statute which requires a taxpayer to pay taxes on revenues which belong to someone else and over which the taxpayer never claims rights of ownership; we find nothing in the Messages Tax Act which allows it to be imposed in so extraordinary a fashion.

Finally, figures representing amounts collected by independent companies with which Bell has traffic agreements appear in Bell's records; the Department urges that these amounts represent gross revenues on which the tax is payable. Generally speaking, the figures that the Department claims are taxable under this theory appear in Bell's records in connection with its administrative function of computing the settlement statements as required by the traffic agreements between it and the independent companies with which its lines interconnect. According to Bell, the only times Bell holds any of these amounts, even temporarily, is when an independent company happens to bill its customers less than it is entitled to receive and retain.

If Bell were not performing the administrative function of calculating the settlements owing each company, these amounts would never appear in its records. The reporting of statistical data to Bell by the independent companies does not constitute receipt of revenue by Bell. Even assuming that the reporting of information to Bell by the independent companies for the purpose of computing the allocations of revenue to which each company is entitled could be treated as a receipt of money, it is obvious that Bell is not receiving money as "consideration *** for the

transmission of messages," the only type of receipt which is taxable. (Ill. Rev. Stat. 1979, ch. 120, par. 467.1.) It was clearly not the intention of the legislature that performance of a mechanical calculating function, a role which could no doubt be fulfilled as satisfactorily by an accounting firm or an escrow trustee, should subject the calculator to a messages tax on all the toll revenues relevant to the calculation. The circuit and appellate courts were correct when they held that the amounts which are reported to Bell by other telephone companies in calculating the settlement figures do not subject Bell to a tax on those amounts.

The Department argued unsuccessfully in the appellate court that Bell's tax returns are improper because they are based on gross services rendered rather than on gross receipts. (95 Ill. App. 3d 115, 133-35.) Although the Department asserts in several places in its briefs before this court that Bell's tax calculations reflect something other than gross receipts, it does not appear to raise this precise argument before us, and we do not address it here.

The judgment of the appellate court is affirmed.

*Judgment affirmed.*

JUSTICE CLARK took no part in the consideration or decision of this case.

JUSTICE GOLDENHERSH, specially concurring:

I agree with the conclusion reached by the majority but cannot agree with all that is said in the opinion. The only reason for not holding the taxpayer liable here is that the Department's erroneous construction of the statute prevented the taxpayer from recovering from its subscribers that portion of the tax authorized to be collected under section 36 of the Public Utilities Act (Ill. Rev. Stat. 1977, ch. 111²/₃, par. 36).

Article XII(1) of the 1974 edition of the rules and regulations published by the Department of Revenue, without

further qualification, provides that a taxpayer who transmits a message in interstate commerce "is not liable for tax with respect to his receipts therefrom." That, of course, erroneously construes the statute.

Save for the fact that the taxpayer was deprived of the opportunity to recover a portion of the tax from its subscribers the erroneous interpretation by the Department should not serve to preclude collection of the tax. As the court said in *Martin Oil Service, Inc. v. Department of Revenue* (1971), 49 Ill. 2d 260, 269:

> "It is undeniable that weight should be given a contemporaneous construction placed on an ambiguous statute by the officers charged with the duty of administering it. We do not believe the statute is ambiguous. Even if ambiguity is assumed, the rule obviously cannot be invoked to prevent those officers from rectifying an erroneous construction. An administrative construction of a statute is not binding if it is erroneous. *Norwegian Nitrogen Products Co. v. United States*, 288 U.S. 294, 315, 77 L. Ed. 796, 807; *Superior Coal Co. v. Department of Revenue*, 4 Ill. 2d 459, 468."

Finally, I cannot agree with the majority's interpretation of the statute or with its conclusion concerning the legislative intent. I fail to see why it was necessary to engage in a discussion concerning the last antecedent rule of statutory construction and ignore authority which considered a statute containing the same language. In *Standard Oil Co. v. Department of Finance* (1943), 383 Ill. 136, 141, it was held that a tax "imposed upon persons engaged in the business of selling tangible personal property at retail in this State" referred to the occupation rather than to the sales. Had the General Assembly intended to limit the applicability of the tax to those messages transmitted in intrastate commerce it would have been a simple matter to do so.

Furthermore, I cannot agree with the majority's conclusion that this is a "contracting" form of tax statute. Most

266

taxpayers have encountered expanding forms of tax statutes, but a tax statute allegedly intended to contract the scope of its applicability is, indeed, rarely to be found. The justification for the contracting statute theory is that it "saves the statute from invalidity in the event Federal law were held to preclude taxation of some of the intrastate services incorporated into the first sentence of section 2." (93 Ill. 2d at 254-55.) There is, of course, no authority cited in support of this statement for the obvious reason that there is none. In the face of a trend over a 50-year-period to expand the scope of permissible State taxation it appears unduly speculative to surmise that the General Assembly might have anticipated the imposition of a restriction which would limit the scope of its authority to impose a tax on the activity of the taxpayer.

These cases should not be decided in a vacuum. The only common sense reading of the statute is that the General Assembly wished to extend the scope of the tax to the extent constitutionally permissible. It is unfortunate that the failure to promulgate appropriate regulations permits the taxpayer to escape payment of the tax.