(No. 35556.—

IOWA-ILLINOIS GAS AND ELECTRIC COMPANY, Appellee, *vs.* ILLINOIS COMMERCE COMMISSION, Appellant.

*Opinion filed May 18, 1960.*

KLINGBIEL, J., took no part.

GRENVILLE BEARDSLEY, Attorney General, of Springfield, and HARRY R. BEGLEY, Special Assistant Attorney General, of Chicago, (GEORGE PHOENIX, JR., of counsel,) for appellant.

ROBERT G. GRAHAM, DUANE P. BENSON, W. B. WATERMAN, and EDWARD J. HARTMAN, (GRAHAM, CALIFF, HARPER & BENSON, of Moline, of counsel,) for appellee.

Mr. JUSTICE DAVIS delivered the opinion of the court:

In February, 1958, the Iowa-Illinois Gas and Electric Company, filed revised rate schedules with the Illinois Commerce Commission which would have provided increased revenues of approximately $530,000 from the sale of electric power in Rock Island, Henry and Whiteside counties.

The Commission suspended the proposed rates and held hearings which culminated in the Commission's order of December 22, 1958, cancelling the proposed rates and directing the filing of another revised rate schedule which would increase gross electric revenue approximately $269,500 for 1958. Upon appeal by the company, the circuit court of Rock Island County reversed and set aside the order of the Commission. The case comes before us on appeal by the Commission from the ruling of the trial court.

The company supplies electric service to the cities of Rock Island, Moline, East Moline, Silvis and Milan, and neighboring rural areas as well as to a substantial area in Iowa. Generating plants in Iowa and Illinois are connected by transmission lines, and interconnected with the systems of other electric utilities.

Between the years 1953 and 1958, the company made net additions to property purportedly serving the Illinois territory in an amount of approximately $8,500,000. Dur-

ing the same period the customers of the company increased from 43,758 to 46,827, with a 21 per cent increase in maximum kilowatt demand from 75,596 to 91,302 and an 18.6 per cent increase in sales from 313,812,292 to 372,270,124 kwh.

The original cost of the electric properties on the company's allocation to Illinois as of December 31, 1957, was $29,963,195 and the depreciated original cost, stated to be $23,536,035. After allowance for the net additions made in 1958, the depreciated original cost with construction work in progress was estimated to be $25,547,452 as of December 31, 1958.

Evidence was submitted on reproduction cost. It was estimated that the reproduction cost new as of December 31, 1957, was $58,174,680 and reproduction cost depreciated $43,847,417. The reproduction cost study according to the engineers who prepared it, was developed by repricing certain items of property and by trending the original cost of the balance. Both physical and functional depreciation was purportedly assessed through a physical inspection of the parts of the plant and through the use of survivor curves on the life of other parts of the property. The depreciated reproduction cost was finally based upon "a condition per cent of the property items."

The system employed by the company to allocate property between Iowa and Illinois for the production and transmission facilities was based upon the noncoincident peak demands of the respective service areas, *i.e.,* Illinois, Davenport, Iowa City and Fort Dodge. A floor space basis was used for the administration properties while general plant equipment was allocated on a meter relationship. On the basis of the company computation, 38.4 per cent of all generating property both in Illinois and Iowa and 45 per cent of the transmission property in the Quad-Cities area was allocated to Illinois. Other methods of allocation could

have been adopted and if the basis had been kilowatt hours used, the allocation to Illinois would have been between 33.9 and 38.4 per cent.

The company offered evidence on rate of return by submitting a study of the return on twenty industrial income stocks which show a return of over 7 per cent. Its witness also gave his opinion on the present day costs of money and concluded that a fair return to the company would be in excess of 6.4 per cent. An exhibit prepared by the staff of the Commission showed that the company was already obtaining a return from its Illinois properties on the basis of equity capital employed of 14.53 per cent, and if the proposed increased rates were allowed that return would go to 17.37 per cent. Another exhibit showed that on the same computation basis as used in connection with the industrial stocks, the return on the company's investment was 6.57 per cent for 1957, on the old rates, as compared to 7.67 per cent for the industrials. The annual report reflected that the company had no immediate requirement for any refinancing of bonds since its first bond maturities were in 1977; that, for the years 1955 through 1957, it had annually increased its net income; and that the estimate of such income for 1958 showed an increase over 1957.

The evidence showed that the company's revenue from its Illinois properties for the year 1956 was $7,474,876, while the 1957 revenue was $7,975,743, an increase of over $500,000. While operating expenses for 1957 were larger than in 1956, $6,284,428 as opposed to $5,874,007, there was still an increase in net income of $100,000. Based on the 1958 estimated increased revenue and expenses, the company would still gain in net revenue.

The actual figures for the first five months of 1958 showed an increase in net income of 5.1 per cent over the budget figure which the company had set. The revenue for the entire year of 1958 was estimated to be $8,340,000,

approximately $360,000 over the 1957 revenue, and with the $269,570 increase in rates allowed by the order, the total increased revenue over the test year of 1957 would actually be $630,000. In proposing the new schedule of rates seeking a $530,000 increase the company did not reflect any increase in sales or revenue but merely added the $530,000 to the actual figures of 1957 in making its projected rate requirements.

At the conclusion of the hearings, the commission found that, based on the method of allocation of facilities between Iowa and Illinois submitted by the company, the depreciated original cost of the property serving Illinois would be $25,547,452 as of December 31, 1958. The depreciated reproduction cost was found to be $46,092,122. After considering all factors of valuation the commission found that the fair value of the property serving Illinois was $31,600,000 including a $1,000,000 allowance for working capital, materials and supplies. The order further found 5.85 per cent to be a fair rate of return and ordered that new rates be filed to produce a $269,570 increase in revenue rather than the company's proposed increase of $530,000.

This order was set aside by the circuit court of Rock Island County, from which decision the Commission prosecuted this appeal. It is the contention of the company, supported by the trial court, that the order of the Commission was unreasonable in that the Commission failed to give proper consideration to reproduction costs in arriving at a rate base of $31,600,000, and that the rate of return of 5.85 per cent is against the manifest weight of the evidence. The Commission argues that the record fully supports its order, and that the trial court erred in substituting its judgment for that of the Commission.

In determining this appeal we must be mindful of the limitations upon the power of courts to review orders of the Commission. Authority to review such orders is derived from section 68 of the Public Utilities Act, (Ill. Rev.

Stat. 1959, chap. 111⅔, par. 72,) which provides that the findings and conclusions of the Commission on questions of fact shall be held *prima facie* true; and that the Commission's order shall not be set aside unless it clearly appears that the finding of the Commission was against the manifest weight of the evidence. (*Village of Apple River* v. *Commerce Com.* 18 Ill.2d 518; *Chicago Junction Railway Co.* v. *Commerce Com.* 412 Ill. 579.) We have long held that the decision of the Commission is entitled to great weight as being the judgment of a tribunal appointed by law and informed by experience. *Village of Apple River* v. *Commerce Com.* 18 Ill.2d 518, 523; *Public Utilities Com. ex rel. City of Springfield* v. *Springfield Gas and Electric Co.* 291 Ill. 209.

This deference to the judgment of the Commission is especially appropriate in the area of fixing rates. Quoting from the *Springfield Gas Co. case,* we said in *Produce Terminal Corp.* v. *Commerce Com. ex rel. Peoples Gas Light and Coke Co.* 414 Ill. 582, 590: "A just and reasonable rate, therefore, is necessarily a question of sound business judgment rather than one of legal formula, and must often be tentative, since exact results cannot be foretold. * * * Like so many other questions in the law that involve reasonableness of conduct, it is a question of fact to be settled by the good sense of the tribunal it may come before."

The power to make rates, of necessity, requires the use of pragmatic adjustments which may be called for by the particular circumstances. (*Federal Power Com.* v. *Hope Natural Gas Co.* 320 U.S. 591, 602, 88 L. ed. 333, 344; *Federal Power Com.* v. *Natural Gas Pipeline Co.* 315 U.S. 575, 586, 86 L. ed 1037, 1050.) This, of course, does not mean that the Commission may ignore pertinent factors affecting the rate structure. In *Illinois Bell Telephone Co.* v. *Commerce Com.* 414 Ill. 275, 286, we stated the guiding rule for the Commission: "In the final analysis, the rates fixed by it (in fixing prices as low as possible for the gen-

eral public purchasing the services) should be sufficient to provide for operating expenses, depreciation, reserves that are necessary in good business judgment and operations and a reasonable return to the investor on the basis of the fair value of the utility property." We there set aside the order of the Commission for its failure to consider certain pertinent factors, including reproduction costs, in determining the rate base.

In the case at bar the Commission found that the depreciated original cost of the facilities allocated to Illinois was $24,547,452 and depreciated reproduction cost was $46,092,122. There is ample evidence in the record to sustain these figures. The Commission further found that the fair value of the company's property allocated to Illinois was $31,600,000. The company complains of this finding. It contends that the rule of *Illinois Bell* requires that the Commission give at least equal weight to reproduction cost as compared to original cost. The company therefore argues that the finding of fair value is against the manifest weight of the evidence because it is equivalent to a weighting of approximately 25 per cent reproduction cost depreciated and 75 per cent original cost depreciated.

We cannot agree that the statutory concept of "fair value" of property for determining a rate base can be reduced to a mathematical formula. Fair value of the property of vast utilities cannot be resolved by pithy slogans of willing buyers and willing sellers, or the sometimes useful half truth that the worth of a thing is the price it will bring. Fair value must be determined by sound judgment based upon careful examination of data which is oftentimes complex. It is not susceptible of exact determination.

All we held in *Illinois Bell* was that it is unreasonable to totally ignore reproduction costs and certain other pertinent factors.

In the case at bar, the Commission carefully considered and made findings as to the property allocation of facilities

between Illinois and Iowa, the depreciated original cost and the depreciated reproduction cost. It further considered the methods used to determine the foregoing figures, and the lack of evidence with respect to obsolescence. The reproduction cost study showed that many items were from 220 to 300 per cent over original cost, thereby indicating considerable age and possible obsolescence. Consideration of the complex record before us gives reason to the rule that the determination of fair value is peculiarly a matter for the Commission which has expert knowledge and great experience in these matters. (*City of Chicago* v. *Commerce Com.* 15 Ill.2d 11, 13 and 14.) In the case at bar the finding of fair value was prefaced by a careful and full consideration of all pertinent factors. It was not clearly against the manifest weight of the evidence and must be upheld.

We next turn to the Commission's finding that 5.85 per cent represents a fair rate of return after allowing for all operating expenses. An expert witness for the company analyzed 20 industries which reflected an average return on capital of 7.03 per cent. He further testified that the company was entitled to a reasonable return of between 6.4 and 7 per cent. However this testimony did not take into consideration that the company had a capitalization of 42 per cent common stock, 12 per cent preferred, and 46 per cent bonded indebtedness; that the first maturities on its bonded debt are 18 years hence; and that its bonds bear interest at rates which vary from 2¾ per cent to 3⅜ per cent while some of the 20 selected companies chosen by the company's witness were capitalized on a 100-per-cent common stock basis. Cf.: *City of Alton* v. *Commerce Com.* 19 Ill.2d. 76.

Upon all available data, the Commission concluded that the actual cost of the company's capitalization, as opposed to the hypothetical present cost of capital, was 5.44 per cent. We have examined the entire record before the Com-

mission, which consists of 852 pages and 36 exhibits, and while the precise mathematical methodology employed by the Commission and the company may be mooted in economic debate, we cannot say that the finding of the Commission that the actual cost of the company's capitalization was 5.44 per cent is clearly against the manifest weight of the evidence.

After such findings, it was the duty of the Commission to fix just and reasonable rates and to use a rate base which represented the fair value of the utility property arrived at after full and proper consideration of its original and reproduction cost. The rates fixed by the Commission should be sufficient to provide for operating expenses, depreciation, reserves that are necessary in good business judgment and operation, and a reasonable return based upon an appraisal of the opportunities for investment in other enterprises involving similar risks. *Illinois Bell Telephone Co.* v. *Commerce Com.* 414 Ill. 275; *Public Utilities Com. ex rel. City of Springfield* v. *Springfield Gas and Electric Co.* 291 Ill. 209.

A just and reasonable rate, which is the ultimate concern "can never exceed—perhaps can rarely equal—the value of the service to the consumer, and on the other hand it can never be made by the compulsion of public authority so low as to amount to confiscation." (*Public Utilities Com. ex rel. City of Springfield* v. *Springfield Gas and and Electric Co.* 291 Ill. 209, 216.) As we said in *Peoples Gas Light and Coke Co.* v. *Slattery,* 373 Ill. 31, 68: "It has been held that a reasonable rate is something other or higher than one not strictly confiscatory, the difference, if any, being determined with finality by the appointed officers of the State."

In the case at bar the rate of return of 5.85 per cent is above the actual cost of capital to the company, is not confiscatory, and is well within the range of the legitimate discretion of the Commission. While a proper judicial re-

view of orders of the Commission requires a study of the reasonableness of the specific findings of the Commission which support its ultimate determination of rates, we need not ignore the ultimate result of the Commission's order, which will result in an increase in revenue of $269,570, or a 3½ per cent increase in revenues before taxes and an increase of over 7 per cent in net income after Federal taxes.

After an analysis of this record as a whole and consideration of the specific findings of the Commission, we cannot say that its order was clearly against the manifest weight of the evidence. Rather, we believe that it represents the considered judgment of a specialized and expert body, based upon all relevant factors, and supported by the record.

For the foregoing reasons, the judgment of the trial court setting aside the order of the Commission, must be reversed and the order of the Comission confirmed.

*Judgment reversed; order of Commission confirmed.*

Mr. JUSTICE KLINGBIEL took no part in the consideration or decision of this case.