CENTRAL ILLINOIS LIGHT COMPANY *et al.*, Plaintiffs-Appellees, *v.* COMMERCE COMMISSION, Defendant-Appellant—(ALTON and SOUTHERN RAILROAD *et al.*, Defendants-Appellants.)

(No. 72-110;

Third District—March 12, 1973.

William J. Scott, Attorney General, of Chicago, and Westervelt, Johnson, Nicoll & Keller, of Peoria, (John H. Doeringer, of counsel,) for appellants.

C. V. O'Hern, of Peoria, for appellees.

Mr. PRESIDING JUSTICE STOUDER delivered the opinion of the court:

Alton and Southern Railroad, together with forty five other railroads (hereinafter railroads) filed a petition with the Illinois Commerce Commission on August 26, 1968, requesting that the Commission permit an increase in Illinois intrastate rates. The Commission granted the petition and rehearing and reconsideration was requested by four electrical utilities, Central Illinois Light Co., Central Illinois Service Co., Illinois Power Co. and Electrical Energy Inc., hereinafter referred to as the intervenors. After the petitions of the intervenors for rehearing were finally denied by the Commission on September 17, 1969, the intervenors commenced this action in the Circuit Court of Peoria County seeking review of the Commission's order. The railroads moved for dismissal of the action claiming the time for seeking judicial review had expired and the motion to dismiss the action was granted by the Circuit Court of Peoria County. On review to the Illinois Supreme Court at the instiga-

tion of the intervenors, the judgment of the Circuit Court of Peoria County was reversed in *Central Ill. Light Co. v. Commerce Com.*, 47 Ill.2d 257, 265 N.E.2d 154, and remanded to the Circuit Court for further proceedings. Such further proceedings were held resulting in a judgment of the Circuit Court that the order of the Commission was invalid and the cause was remanded to the Commission for further proceedings. The judgment of the court holding the Commission's order invalid has been appealed to this court by the railroads and the Commission.

On June 24, 1968, at the request of the nation's railroads the Interstate Commerce Commission granted a general interim 3% rate increase in interstate freight rates. Requests for additional increases were postponed for further consideration but were later granted in January, 1969.

In August, 1968, forty six railroads doing an intrastate freight business in Illinois petitioned the Illinois Commerce Commission seeking approval of their tariff schedule 259A which represented increases in intrastate freight rates similar to those approved for interstate freight rates by the Interstate Commerce Commission in June, 1968. Tariff schedule 259A was approved finally on September 17, 1969 and is the only order subject to this appeal. Later, the railroads in a subsequent proceeding, sought approval of their tariff schedule 259B representing increases similar to those allowed in the final order of the Interstate Commerce Commission in January, 1969. The order of the Illinois Commerce Commission approving tariff schedule 259B is the subject of another appeal pending in this court in case number 72-111 and although involving similar questions it will be dealt with separately.

The first assignment of error urged by appellants is that the intervenors had no standing to seek review of the Commission's order since such order is not reviewable as such. According to the appellants, parties dissatisfied with a general rate order are required to institute administrative proceedings questioning the reasonableness of a particular rate or category of rates. In support of this contention appellants cite the construction of Federal statutes containing similar provisions as applied in *Atlantic City Electric Co. v. United States* (1969), 306 F.Supp. 338, (because of an equal division of the Court this case was affirmed without opinion in *Atlantic City Electric Co. v. United States* (1970), 91 S.Ct. 259, and (1971), 91 S.Ct. 579.)

■■ We believe the intervenors do have standing to seek judicial review of the Commission order for several reasons. First and foremost we believe the prior Supreme Court case (*Ill. Central Light Co. v. Commerce Com.*, 47 Ill.2d 257, 265 N.E.2d 154) is *res judicata* on this issue. The absence of any standing on the part of the intervenors to maintain

the legal action could and should have been urged as an additional reason supporting the action of the trial court in dismissing the complaint for judicial review. The failure of the appellants to raise such issue before the Supreme Court at a time when the resolution of such issue was appropriate now precludes them for questioning the right of the intervenors to maintain the action.

■■ Additionally we believe the language of section 72 (Ill. Rev. Stat. 1969, ch. 111⅔, par. 72) authorizes the judicial review sought by the intervenors. In so far as is pertinent said section provides, "Within 30 days after the service of any order or decision of the Commission  *  *  * any person or corporation affected by such rule, regulation, order or decision may appeal to the circuit court  *  *  *". The statute authorizing judicial review makes no distinction between the types of action of the Commission which may be reviewed. This issue does not appear to have been raised in any prior Illinois case apparently because the language of the statute is so broad that problems were not thought to exist. In *Village of Apple River v. Commerce Com.*, 18 Ill.2d 518, 165 N.E.2d 329, for example, numerous municipalities sought review of a Commission order increasing telephone rates even though such municipalities made no claim concerning the unreasonableness of a particular rate or rate category.

The railroads and Commission on this appeal argue the order included sufficient findings to justify the result and the trial court erred in holding to the contrary. In seeking to have the order of the Commission set aside, the intervenors made two basic but related contentions. First, the order of the Commission did not make sufficiently specific findings of fact and second, the Commission failed to determine and reflect in its order necessary factors relating to the propriety of Illinois intrastate freight rates *i.e.* rate base of assets used in connection with intrastate freight, the income and expenses attributable to intrastate freight transportation and finally the rate of return attributable to assets devoted to intrastate freight transportation.

■■ The principle regarding review of orders of the Illinois Commerce Commission are well settled. It is sufficient to say that the order of the Commission should be deemed *prima facie* true and correct, the legislative expertise of the Commission should be given substantial deference and finally the order of the Commission should be approved unless unsupported by evidence or contrary to some rule of law. *Illinois Bell Telephone Co. v. Commerce Com.*, 414 Ill. 275, 111 N.E.2d 329.

The increased intrastate freight rates were sought by or on behalf of forty six railroads. Financial data and exhibits relating to the operations of fifteen of the railroads were presented before the Commission,

a major portion of such evidence being presented by Halpin, a cost witness employed by the Western Railroad Traffic Association. The evidence relating to this group of fifteen railroads concerned systemwide operations without segregation of interstate operations from intrastate operations. This group of railroads represented 90 percent of the total mileage operated in the State of Illinois by all Class 1 and Class 2 line haul carriers.

Evidence was given concerning data, including index numbers relative to the revenue, expenses, net income and ton-miles of freight handled for fifteen of the railroads herein for the first half of the years 1966, 1967 and 1968. As found by the order of the Commission, "The net railway operating income for these selected railroads fell from $226,289,055 in the first half of 1966 to $119,194,098 in the first half of 1968. Based on the index of 100 for the 1966 figure, the index for 1968 is 52.67." The decreases in net operating income were analyzed in terms of their relationship to increased labor costs, increased payroll taxes, increased cost of material and increased local taxation. Of the foregoing factors except for local taxation, the other increased costs were applicable to the operation of the railroads generally and had no particular application to either interstate or intrastate operations. Three major railroads (included in the group of fifteen discussed before) presented evidence describing their rates of return in 1967 on allocated portions of their Illinois properties. The method of allocating the carriers' Illinois investments and expenses was to use a revenue apportionment as between state and interstate traffic revenue.

The basic contention of the intervenors is that there is neither finding of fact nor evidence of the value of assets used or useable in intrastate freight transportation by the three railroads which made any effort to reflect Illinois intrastate operations in their financial statistics. Furthermore, according to the intervenors, even if there was evidence of the Illinois rate base respecting such three railroads there was no such evidence regarding the other twelve railroads which furnished data only on systemwide operations or for the other thirty one railroads which presented no financial information.

Referring to the exhibits of the railroads four, five and fifteen, which were respectively the financial data of Chicago & Eastern Illinois, Chicago, Burlington & Quincy and Illinois Central Railroads, incorporated by reference in the order of the Commission, the order of the Commission observes;

> "The Illinois rates of return of these railroads as shown by the aforesaid exhibits were, in 1967, respectively: less than 0, .26% and 2.66%. These aforesaid exhibits are properly admitted into

this case and may be considered along with other indicative items to assist this Commission in determining if there is a need on the part of the railroads for additional revenue from intrastate traffic to enable them to realize a fair return on such traffic.

The evidence shows that the systemwide rate of return of the Illinois Central was 2.56% before the application of Ex Parte 259 increases (referring to increases approved by Interstate Commerce Commission applicable only to interstate freight rates) and is expected to be 3.81 after such increases. This would indicate, at least for the Illinois Central Railroad:

1. That its interstate and intrastate rates of return were substantially identical before application of the Ex Parte 259 increase.

2. That its Illinois intrastate rate of return (2.66%) is substantially less than its systemwide rate of return (3.81) after such increase.

3. That since the interstate and intrastate rates of return were within .1 of 1% of each other before the interstate increase, if the same increase authorized in interstate commerce is now authorized in intrastate rate of return would logically not be much different from the 3.81% interstate rate of return."

Concededly the foregoing recital in the order of the Commission was based in large measure on the financial data supplied in the three exhibits by the three railroads together with accompanying testimony explaining the financial data. However the intervenors insist that the method or formula utilized in such computations is unsound and so improper that any findings based thereon are legally insufficient.

The formula employed by each of the three railroads was substantially the same. The exhibits and supporting testimony respecting each railroad was presented by different cost accountants employed by the respective railroads. W. J. Hardlannet, Manager of Cost & Economic Analysis of the Illinois Central Railroad, testified extensively on several occasions concerning the financial data of the Illinois Central including the methods of computation used. In the brief of the intervenors his method of computation is referred to as the "Hardlannert formula" and his explanation of the formula is clear even though for reasons hereinafter noted intervenors deny that such a formula has any probative value.

Taking the Illinois Central financial data as an example, there is a computation of the railroad's total revenue separated by states. The total revenue of the railroad from Illinois business is shown as well as the division of such total revenue between intrastate and interstate business. In its accounting procedures, revenues from Illinois interstate business constituted 24.17 percent of the total Illinois business. This ratio was

then applied to Illinois expenses and Illinois assets in order to determine net income from Illinois intrastate business and the value of Illinois intrastate assets.

As may be concluded from the method of computation both expenses and value of assets are allocated in accord with and dependent upon the revenue attributable to Illinois intrastate business. As is pointed out by the intervenors if revenues from Illinois intrastate business are increased then expenses and the value of assets are also increased thereby distorting both the net income computation, rate base and return. Limitations of such a method of computation were admitted by Hardlannert but he nevertheless believed the method of allocation produced results of substantial probative value. As was pointed out by the witness, increases in interstate revenue also produced increases in interstate expenses and rate base when the formula was applied thus tending to neutralize distortion.

■■ It is not necessary to either approve or disapprove the Hardlannert formula as it may be applied in every case. We believe with respect to the issues before the Commission the computations tended to have probative value in determining the Illinois net income from intrastate business and the rate base related thereto. Such evidence is sufficient to support the findings of the Commission and the result based thereon.

The degree of accuracy required in the methods of accounting used depend in large measure on the degree of specificity of the conclusions they purport to support. So far as the general increase in freight rates is concerned in the instant case it does not appear that there is any claim or determination that the increased rates sought by approval of schedule 259A were sufficiently large as to provide the railroads with a reasonable rate of return. Although the railroads were seeking to increase revenues and improve their financial condition the only result of the increase was to reduce but not eliminate the previous unreasonableness of the rate of return. Where the issue arises as to whether particular rates of return either present or prospective are critical issues it well might be that the method of allocation employed in this case might be considered insufficiently precise to justify a particular result. Most cost accounting involves unique methods, some arbitrary assumptions, and produce results subject to varying degree of error. Even though in the instant case both the railroads and the intervenors are subject to state regulation and the application of the Utilities Act it would appear that there are some aspects of accounting practice which are peculiar to each. As observed in *Iowa-Illinois Gas & Elec. Co. v. Commerce Com.*, 19 Ill.2d 436, 167 N.E.2d 414, "The power to make rates, of necessity, requires the use of pragmatic adjustments which may be called for by the particular circumstances." In the foregoing case the Court mentions different

methods which might be utilized in allocating revenue, expenses and assets with respect to electrical generating and transmission facilities in different states although part of the same system. The method of allocation was not an issue in the case since the principal objection to the Commission's order was that of the electric utility claiming inadequate consideration of reproduction costs of the facilities.

This brings us to the next major contention of the intervenors namely that even if the evidence might tend to support the order granting increased rates to the three railroads presenting detailed evidence on intrastate operations, such evidence is insufficient to justify approval of the tariffs applicable to the freight rates of the other rail carriers. It does not appear that this question has been previously considered by the courts of our state even though we believe there have been previous general rate increases applicable to all intrastate rail carriers in the absence of financial information concerning the operations of each carrier affected.

The Commission found, "Exhibit 3 indicates that the Illinois Central was in a comparatively good financial position in 1968, the Chicago and Eastern Illinois in a deficit situation and the Chicago, Burlington & Quincy somewhere between the other two. The aforesaid 3 railroads may be deemed fairly representative of all Illinois railroads." Intervenors expressed doubts that the three railroads may be considered representative but their major argument is that the propriety of rate increases for the three railroads or for the group of fifteen railroads can not be extended to support a result applicable to all forty six railroads.

■■ While the resolution of this issue may not be free of doubt it is our conclusion that the principle of representativeness or similarity may be applied to support the broader aspect of the Commission's order. This conclusion is based in large measure on the nature of the issue involved, the variety of factors and interdependent relationships which must be considered in railroad rate cases and the lack of any substantial benefit either to the public or to customers of the railroad in requiring further refinement of the evidence.

■■ It requires only a cursory consideration of the problems involved in railroad rate determination to conclude that the general rule which requires that a public utility such as a railroad receive or is entitled to receive a reasonable return on its investment can not be applied to railroads in the same manner it is applied to other utilities. Railroads are not only in competition with one another but also with many other forms of transportation which during the last forty years have completely changed the position of the railroads. (*King v. United States* (1952), 344 U.S. 254, 97 L.Ed. 301, 73 S.Ct. 259). The general principle of

monopoly pricing which railroad regulatory bodies were initially established to restrain has lost much of its effect and no longer do increases in rates automatically result in a proportionate increase in revenues. For example if the C&EI which is operating at a deficit, were alone to increase its freight rates there is no assurance that either in the short run or the long run that such an increase would result in increased revenue. Alternative methods of transportation are available to some extent either by using other railroads or other modes of transportation. Thus the situation of most railroads is interrelated and what affects the rates and revenues of one or some of the railroads directly affects the conditions of others.

■■■ Any increase in rates for service is usually sought and approved because it tends to increase the revenues of the utility and if appropriate a need therefore must be shown measured in terms of reasonable return. Even though an order of the Commission authorizes a general rate increase it is still subject to the requirement of the reasonableness in relation to the adequacy or excessiveness of return. Consequently we do not believe a Commission order is improper merely because it may produce a general increase in revenue. The total revenue must still comply with the requirement of reasonableness under the generally applicable rules. We believe the evidence tends to show that the general increase on freight rates will not produce revenues in excess of reasonable rates of return and consequently the order of the Commission is not improper. In this connection it should be noted that the order of the Commission specifically disclaims that its order determines the reasonableness of any particular rate or rate category.

It is our conclusion that there are sufficient findings in the order of the Commission to support the result reached by the Commission and that such findings are supported by sufficient evidence. Accordingly we believe the Circuit Court of Peoria County erred in vacating the order of the Commission and the judgment of such court is reversed and the order of the Illinois Commerce Commission is confirmed.

Judgment reversed.

DIXON and SCOTT, JJ., concur.