655 N.E.2d 961 (1995)
275 Ill.App.3d 329
211 Ill.Dec. 578
CITIZENS UTILITY BOARD and People of Cook County ex rel. Jack O'Malley, Petitioners-Appellants,
v.
ILLINOIS COMMERCE COMMISSION and Commonwealth Edison Company, Respondents-Appellees.
Nos. 1-94-2714, 1-94-2828.
Appellate Court of Illinois, First District, Fifth Division.
August 25, 1995.
As Modified of Denial of Rehearing October 6, 1995.
*962 Jack O'Malley, State's Attorney of Cook County, Sharon Johnson Coleman, Chief, Public Interest Bureau, Chicago, Marie D. Spicuzza, Leijuana Doss and David I. Fein (Assistant State's Attorneys), and Wanda K. Zatopa and Karen L. Lusson, Citizen Utility Board, for Appellants.
*963 Paul F. Hanzlik, John L. Rogers and Bryan S. Anderson of Hopkins & Sutter, Chicago, Pamela B. Strobel and JoAnne G. Bloom, Chicago, of Commonwealth Edison Company; William R. Quinlan, Michael I. Rothstein and Aimee B. Storin of Phelan, Pope, Cahill & Devine, Ltd., Chicago, for appellee Commonwealth Edison Co.
John P. Kelliher (Special Assistant Attorney General) on behalf of Illinois Commerce Commission.

MODIFIED UPON DENIAL OF REHEARING
Justice THOMAS J. O'BRIEN delivered the opinion of the court:
Petitioners, Citizens Utility Board (CUB) and the People of Cook County (Cook County), appeal from an order of the Illinois Commerce Commission (Commission) approving a tariff filed by Commonwealth Edison (Edison). Petitioners contend inter alia that the tariff, commonly referred to as Rate CS, fails to set forth a schedule of rates, charges or contracts and therefore violates the publication requirements of the Illinois Public Utilities Act. (220 ILCS 5/9-102 (West 1992).) They further argue that, as a result, the tariff contravenes the Act's prohibition against (i) changing rates without 45 days' prior notice to the Commission and the public (220 ILCS 5/9-201 (West 1992)); (ii) charging rates different from the published rates (220 ILCS 5/9-240 (West 1992)); and (iii) providing services at less than the published rates. (220 ILCS 5/9-243 (West 1992).) We agree and reverse.

BACKGROUND[1]
On October 15, 1993, Edison filed with the Commission a proposed "load retention" tariff designated as Rate CS Contract Service, Ill.C.C. No. 4, Original Sheet No. 55.50. The purpose of the tariff, as with load retention tariffs generally, was to maintain existing "load" by inducing customers to remain with Edison rather than utilize an alternative source of energy. Under the terms of the tariff, Edison would achieve load retention by offering discounted rates to a limited number of commercial and industrial users vis-a-vis negotiated contracts.
Specifically, Rate CS applied only to those non-residential customers who were currently taking service under Rate 6L, Large General Service, and who could otherwise engage in uneconomic bypass.[2] The record indicates that there were approximately 1700 Rate 6L customers at the time Edison filed its proposed tariff with the Commission. In order to qualify for Rate CS, these customers would have to file a written application with Edison as well as an affidavit stating the customer's intent to bypass Edison's system. They would also have to provide Edison with evidence verifying (i) the receipt of competitive bids from other suppliers of electricity, (ii) the necessary investment on the part of the customer in order to accomplish the bypass, and (iii) the ability to actually engage in the bypass.
Rate CS further provided that Edison could enter into no more than 25 contracts at any given time, each limited to ten-years in duration. In addition, Edison retained sole discretion in determining whether a customer would have engaged in a bypass absent the negotiated rate. The determination of which customers would be awarded contracts under the proposed tariff likewise rested exclusively with Edison.
With respect to specific rates and charges, the tariff merely indicated that revenues from the discounted rate could not be less *964 than the incremental cost of providing service to the customer, thereby ensuring a positive contribution to the utility's fixed costs.[3] The actual charges for service under Rate CS would be contained in the customer contract. Edison would then submit each contractand the "work papers deriving the charges under the contract"to the Commission Staff for its "review." The tariff itself, however, did not contemplate further Commission approval of each separate contract. Rather, Edison would only file each contract with the Commission "for informational purposes."
Finally, and most important, the Commission would automatically treat both the contract and the supporting work papers on a proprietary basis regardless of content. Thus, any rates or charges set forth in the contract, and the information used in determining those rates or charges, would not be published or open to public inspection.
On November 23, 1993, the Commission suspended the proposed tariff prior to its effective date in order to conduct an investigation into whether its terms were "just and reasonable." (220 ILCS 5/9-201(c) (West 1992).) On March 9, 1994, the Commission continued the suspension a second time up to and including September 13, 1994. During that period, a hearing was held in which CUB and Cook County were granted leave to intervene. The hearing officer also granted motions to intervene on behalf of the following parties: Attorney General of the State of Illinois; Central Illinois Light Co.; City of Chicago; Commission Staff; Duraco Products, Inc.; Illinois Industrial Energy Consumers; Illinois Power Co.; Midwest Cogeneration Association, Inc.; Northern Illinois Gas Co.; and Peoples Gas, Light and Coke Co. and North Shore Gas Co.[4]
At the hearing, Edison presented the testimony of Arlene Juracek, Edison's Assistant Vice President, who testified as to the background and rationale of the proposed tariff.[5] Juracek claimed that developers of cogeneration projects and other independent cogeneration facilities posed a serious threat of competition to Edison's service. In particular, she pointed out that approximately 50 former Rate 6L customers had replaced Edison service with some form of their own cogeneration.
Juracek also addressed Edison's methodology in determining the rates to be charged under the proposed tariff. As previously noted, Rate CS merely indicated that "[r]evenues from service to the customer under such contract ... shall be greater than the incremental costs to serve such customer, ensuring a positive contribution to fixed costs." Juracek explained that "[t]he costs we are proposing to analyze are the variable or out of pocket costs of serving the load of Rate CS customers. Such costs would be the short run marginal costs of service plus any necessary out of pocket costs for additional capacity resources which may be necessary to serve the load."[6] In short, "[r]evenues from Rate CS customers should be sufficient to recover these out of pocket costs, and make some contribution towards the recovery of fixed costs."
In the final analysis, Juracek opined that Rate CS, if approved, would curb the number of large customers leaving the system. This, in turn, would benefit Edison's remaining customers who would otherwise have to bear the burdens associated with the defection of a large user of electricity.[7]
*965 Paul R. Werther, Edison's Energy Services Manager, testified as to how Edison would evaluate the applications for service under Rate CS. Werther explained that Edison personnel would review the applications to determine which customers could in fact bypass the system. Edison would then negotiate with these customers to secure the best possible rate pursuant to Rate CS. Once the parties reached an agreement, both the contract (including the rate or rates to be charged) and the supporting work papers would be filed with the Commission on a confidential basis. This would allow Edison to negotiate the highest possible rate with each customer without having to divulge the prices charged other customers. It would also prevent Edison's competitors from gaining a unfair advantage from the unnecessary disclosure of service and pricing information.
Dennis L. Sweatman, Director for the Economic Development Program, appeared on behalf of the Commission Staff. Sweatman indicated that Rate CS is similar in form and substance to numerous other load retention tariffs previously approved by the Commission.[8] Consistent with those other tariffs, Sweatman recommended that Edison submit additional information to the Commission Staff for its review, including a detailed breakdown of the demand and energy charges in the proposed contract as well as calculations demonstrating the amount by which the rates under the proposed contract will be discounted from standard rates.
George R. Edgar, Executive Director of Wisconsin Energy Conservation Corporation, testified on behalf of the City of Chicago. Contrary to Sweatman, Edgar maintained that Rate CS was more sweeping than previous load retention tariffs approved by the Commission and represented a "significant departure from traditional regulation." Edgar pointed out that several short term and long term rate issues still needed to be addressed. For example, he noted that potential Rate CS customers will have even more bypass options in the future as the alternative energy industry continues to develop. If these bypass options are exercised, then captive ratepayers will have to bear the burden of having large customers leave the system which, by then, will have already been equipped to handle new capacity. In other words, Rate CS would simply defer until tomorrow that which it is designed to prevent today; namely, the loss of a large consumer of electricity.
As a remedy to these shortcomings, Edgar offered a number of recommendations to improve Rate CS. First, he suggested reducing the length of the contracts from ten-years to five-years. As he explained, "[t]he ten-year term proposed by Edison is beyond the forecast date, based on current projections, when Edison would need to commit to new intermediate power capacity." Permitting Edison to contract for service beyond the date in which it must commit to new capacity would, in his opinion, simply increase the risk of repeating the process of discounting rates. As a result, captive ratepayers would be forced to confront the same dilemma they now face, i.e., the loss of a large consumer of electricity, except that more fixed costs will be at risk.
Edgar also cautioned the Commission to be mindful of "the potential changes in the regulatory and market environments that may occur in the industry in the next five years." He warned that "[t]hese changes could radically change the nature of how business will be done, including the role of regulation. The likely volatility of the industry makes shorter contracts preferable, particularly when the need to make new generation decisions are forecast for early 2000."
Edgar's other recommendations included (i) prohibiting Edison from aggregating the loads of captive customers with the loads of Rate CS customers; (ii) requiring Rate CS customers to seek service from Edison on other terms at the end of the contract period rather than unconditionally return to standard tariffs; and (iii) implementing a price floor (15% above marginal costs) which would reflect long-run marginal costs and short-run *966 marginal costs depending, respectively, on whether new capacity is or is not required.
In response to Edgar's testimony, Edison presented the testimony of Dr. Morton I. Kamien, a professor at the Kellogg Graduate School of Management, Northwestern University. Kamien argued that Edgar's testimony was internally inconsistent, noting that although Edgar recognized the benefits of Rate CS, he nevertheless proposed modifications to Rate CS which would render it nearly impossible to achieve those benefits.
Kamien also claimed that many of Edgar's conclusions were empirically unsupported and ran counter to accepted economic theory. For instance, Edgar's recommendation that Rate CS customers should be prevented from returning to regular tariff rates at the conclusion of the Rate CS contract would only add additional incentive for potential Rate CS customers to presently leave the system. In addition, implementing a price floor of 15% above marginal costs on all Rate CS contracts would be, in Kamien's opinion, unreasonable since (a) it is based upon the counter-intuitive supposition that business people are incapable of negotiating an advantageous contract, and (b) it is preferable to retain a customer who pays a rate in excess of incremental costs, regardless of how much, rather than lose that customer altogether. Kamien concluded, therefore, that Rate CS should be adopted without Edgar's proposed modifications.
Three other witnesses stated one or more objections to Rate CS in its current form. Peter Larmon, Manager of Marketing Administration and Demand Side Management at Northern Illinois Gas Co., claimed that Rate CS would diminish the market structure in connection with the development of cogeneration in Edison's service area. Roger L. Cole, past Vice President of the Midwest Cogeneration Association, Inc., likewise asserted that Rate CS would discourage cogeneration.
Finally, Peter Lazare, a member of the Commission Staff assigned to examine cost-of-service and rate design, voiced several concerns in his "pre-filed" testimony regarding Edison's methodology for computing incremental costs. He stated in pertinent part:
"The Company filing provides incomplete information on incremental costs for Rate CS which impedes a determination of how the Company proposed to calculate incremental costs for Rate CS. Thus, it cannot be determined whether the proposed approach is consistent with Commission-approved costing methods. Furthermore, if an alternative approach is being proposed, then there is insufficient information in the filing to determine the reasonableness of the Company's proposed incremental cost calculation."
Nevertheless, counsel for the Commission Staff withdrew Lazare's testimony on the day he was scheduled to be cross examined. The hearing officer thereafter rejected CUB's attempt to admit Lazare's testimony as a party admission during CUB's cross examination of Sweatman.
At the conclusion of the hearing, the Commission found Rate CS consistent with its "long-standing policy to discourage `uneconomic bypass' of a utility's system" and, over the dissent of Chairman Dan Miller, approved Rate CS subject to certain modifications. The modifications consisted of, among other things, (i) reducing the length of Rate CS contracts from ten-years to five-years; (ii) limiting the availability of Rate CS to existing load[9]; and (iii) requiring Edison to file semi-annual reports. These reports were to contain a description of kilowatt usage as well as an assessment of the impacts on Edison's most recently approved Least-Cost Energy Plan. In addition, the Commission ordered Edison to submit for Staff review extensive information relating to each contract entered into under Rate CS.
CUB and Cook County thereafter separately appealed the Commission's order directly to this Court pursuant to section 10-201 of the Public Utilities Act. (220 ILCS 5/10-201 (West 1992).) On appeal, petitioners *967 raise no less than eighteen issues for our consideration. However, because we hold Rate CS violates the filing and publication requirements of the Act, we necessarily limit our opinion to a discussion of those issues.

OPINION
As is the case in most jurisdictions, the Illinois General Assembly has seen fit to impose certain regulations on investor-owned public utilities. Included in these regulations is the requirement that a public utility charge only those "rates" which the Commerce Commission has deemed "just and reasonable." (220 ILCS 5/9-201(c) (West 1992).)[10] To ensure that rates are in fact "just and reasonable", the Act mandates that "[e]very public utility shall file with the Commission and shall print and keep open to public inspection schedules showing all rates and other charges, and classifications, which are in force at the time for any product or commodity furnished or to be furnished by it, or for any service performed by it, or for any service in connection therewith, or performed by any public utility controlled or operated by it." (emphasis added) (220 ILCS 5/9-102 (West 1992).) In addition to the foregoing, section 9-102 of the Act further provides that "[e]very public utility shall file with and as a part of such schedule and shall state separately all rules, regulations, storage or other charges, privileges and contracts that in any manner affect the rates charged or to be charged for any service." (emphasis added) 220 ILCS 5/9-102 (West 1992).[11]
Thus, in order to comply with the Act, a public utility must file and publish a schedule of rates and charges, including any contracts which may affect the same. These requirements embody the Commission's plenary jurisdiction to regulate public utilities with respect to the reasonableness of rates. They also help to prevent unlawful price discrimination. 220 ILCS 5/9-241 (West 1992).

I
In this case, Edison argues that the filing of Rate CS with the Commission and its subsequent publication satisfy these requirements. We disagree. In approving Rate CS, the Commission, inspired by the pursuit of discouraging uneconomic bypass, has allowed Edison to file a tariff that does not contain any rates.
As previously noted, the actual charges under Rate CS are not included in the proposed tariff on file with the Commission nor open to the public for inspection. In fact, there are no charges; Rate CS merely grants Edison the prospective right to set rates in the future. The tariff itself makes clear that "[t]he charges for service hereunder shall be the charges contained in the contract between the Company and the customer." (Emphasis added). These contracts do not currently exist. More important, they did not exist at the time Edison filed its tariff. Indeed, Edison had not even determined which of the 1700 Rate 6L customers would be awarded the contracts. Without the contracts, there are no rates.
Accordingly, in light of the fact that there were no rates at the time Edison filed Rate CS because the contracts containing those rates did not yet exist, we find that Rate CS does not comply with section 9-102 of the Act. For this reason alone, the Commission's order approving the tariff must be reversed.
Nevertheless, Edison argues that Rate CS does in fact include a schedule of charges (under the guise of a "parameter" of possible rates) despite the fact that the contracts which will contain the charges do not exist. To support this argument, Edison cites a *968 provision in the tariff which indicates that "[r]evenues from service to the customer under such contract, which shall reference all applicable rates and riders, shall be greater than the incremental costs to serve such customer, ensuring a positive contribution to fixed costs." Stripped of its technical jargon, however, this provision does nothing more than limit Edison's otherwise unfettered right to establish any rate it so desires as long as that rate is not below its marginal cost. In other words, the alleged "rate" in Rate CS is simply any rate Edison eventually chooses provided the company does not, in laymen's terms, lose money.[12]
This is not to say that the Commission may never under any circumstances approve a tariff which truly contains a "parameter of rates", particularly where the tariff otherwise complies with the publication requirements of the Act, discussed infra. (See, for example, City of Norfolk v. Virginia Electric and Power Co. (1955), 197 Va. 505, 90 S.E.2d 140 (commission did not exceed its authority in approving "escalator clause" containing a mathematical formula under which rates would fluctuate with the wholesale cost of natural gas).) However, the Commission may not approve a tariff which permits a utility to set its own rates, in futuro, subject only to the condition that the rates contribute to the utility's fixed costs. Such a condition is implied in every "just and reasonable" rate and, standing alone, does not properly constitute a "rate" under the Act.
We also summarily reject the Commission's rather specious contention that it has the authority under section 9-103 of the Act to approve a tariff which sets forth the "parameters within which service shall be provided to qualifying customers." Section 9-103, which largely concerns printing specifications such as typesetting, states that "the schedules referred to in Section 9-102 shall be plainly printed, mimeographed or typewritten in large type, and a copy thereof shall be posted or kept on file in every office of a public utility where the public transacts business with such public utility." The fact that "[t]he Commission may determine and prescribe the form in which the schedules required by this Act to be filed with the Commission and to be kept open to public inspection shall be prepared and arranged, and may change the form from time to time if it shall be found expedient" surely does not empower the Commission to exempt a utility from its statutory obligation to file and publish a schedule of rates and charges.

II
In any event, even if we were to ignore the absence of any rate in the proposed tariff, we still find that Rate CS violates the Act in several respects. First, once Edison finally does negotiate a rate with a customer pursuant to a contract, the actual charges for service will not be kept open for public inspection. At most, the charges will be filed with the Commission on a proprietary basis "for informational purposes." Rate CS will then become effective without further Commission approval.
Clearly, both the filing of the proprietary contracts "for informational purposes" and the failure to keep the same open for public inspection contravenes the language of the Act. Section 9-102 unambiguously mandates that "[e]very public utility shall file with the Commission and shall print and keep open to public inspection schedules showing all rates and other charges * * * and shall file with and as a part of such schedule and shall state separately all * * * contracts that in any manner affect the rates charged or to be charged for any service." (220 ILCS 5/9-102 (West 1992).) That has not been done in this case. In addition, section 9-103 provides that "[a]ny or all such schedules kept as aforesaid shall be immediately produced by such public utility for inspection upon the demand of any person." (220 ILCS 5/9-102 (West 1992).) That could not be done in this case.
As it now stands, Rate CS does not contemplate in any manner whatsoever the public's *969 statutorily mandated right to inspect the actual rates. In fact, the public is prevented from undertaking any meaningful examination because the contracts containing the rates will be filed on a proprietary basis. Under these circumstances, the public cannot intelligently determine whether or not Edison has engaged in price discrimination or other unfair practices. (220 ILCS 5/9-241 (West 1992).) Indeed, it is impossible to verify whether Edison has granted a particular customer any unreasonable preferences or advantages under Rate CS since the actual charges, and the supporting papers used in calculating those charges, will be insulated from public scrutiny.
Instead, Rate CS provides for absolute confidentialityregardless of content on the purported basis that confidentiality would allow the company to negotiate the highest possible rate with each customer and would prevent competitors from gaining an unfair advantage. Although this may be commercially or economically prudent, we believe it is nonetheless improper under the Act. The fact remains that courts cannot by judicial fiat alter the unequivocal meaning of the Act. (Tavern Liquor Supply Co. v. Illinois Liquor Control Commission (1978), 71 Ill.App.3d 1008, 1012, 28 Ill.Dec. 170, 390 N.E.2d 337) ("The judiciary has the responsibility to interpret a statute but does not have the authority to rewrite a statute.") This is so even if it means that Edison will not be permitted to negotiate the highest rate with one customer by keeping confidential the rates Edison charges other customers. Buckellew v. Board of Education of Georgetown-Ridge Farm Community Unit School District No. 4 (1991), 215 Ill.App.3d 506, 511, 159 Ill.Dec. 58, 575 N.E.2d 556, appeal denied, 142 Ill.2d 652, 164 Ill.Dec. 915, 584 N.E.2d 127 (court must construe statute as written regardless of the court's opinion regarding the desirability of the results surrounding the operation of the statute).
To be sure, if strict adherence to the publication requirements of the Act has somehow become anachronistic, it is the responsibility of the General Assembly to modify or eliminate those requirements, not the Commission. (See generally, Tavern Liquor Supply Co. v. Illinois Liquor Control Commission (1978), 71 Ill.App.3d 1008, 28 Ill.Dec. 170, 390 N.E.2d 337.) The value of continued regulation of public utilities in general, and the wisdom of the filing and notice requirements in particular, is a matter strictly within the province of the General Assembly. Until the legislature has spoken, the Commission simply may not abdicate its duties under the Act, including its obligation to effectively oversee pricing and service pursuant to its primary jurisdiction over the reasonableness of the rates to be charged.

III
Edison submits, however, that the deferential standard of review applicable to matters involving the Commerce Commission requires affirmance of the Commission's order. (See, e.g., Iowa-Illinois Gas & Electric Co. v. Illinois Commerce Commission (1960), 19 Ill.2d 436, 442, 167 N.E.2d 414.) We do not quarrel with the fact that the Commission is acutely familiar with the workings of the utility industry and is in a better position to evaluate the reasonableness of proposed rates. (Governor's Office of Consumer Services v. Illinois Commerce Commission (1991), 220 Ill.App.3d 68, 76, 162 Ill.Dec. 737, 580 N.E.2d 920.) Nor do we dispute that the Commission's experience and investigative capacity make it well equipped to carry out this important task.
Indeed, compared with the expertise of the Commission, we freely acknowledge that we do not approach the same level of competence to second guess certain decisions of the Commission in this case. (Iowa-Illinois Gas & Electric Co. v. Illinois Commerce Commission (1960), 19 Ill.2d 436, 442, 167 N.E.2d 414.) For example, we accord due deference to the Commission on its finding, as supported by the testimony of both Juracek and Stutsman, that there exists a need for Rate CS based upon increased competition. We likewise defer to the Commission with respect to the conflicting testimony of Edgar and Kamien as to the feasibility of Rate CS. These truly pertain to the Commission's expertise regarding utility rates. Cerro Copper Products v. Illinois Commerce Commission *970 (1980), 83 Ill.2d 364, 370-71, 47 Ill.Dec. 340, 415 N.E.2d 345.
However, what is at stake here is Edison's compliance with the filing and publication requirements of the Act. In resolving this issue, we do not feel compelled to yield in knee-jerk fashion to the institutional competence of the Commission. It is well established that a court is not bound by a Commission's decision on a question of law. (Business & Professional People v. Illinois Commerce Commission (1989), 136 Ill.2d 192, 204, 144 Ill.Dec. 334, 555 N.E.2d 693). This is particularly true where the question of law does not touch upon the Commission's expertise in setting utility rates.

IV
In light of our finding that Rate CS does not comport with section 9-102 of the Act, it follows that it violates other related sections of the Act. Section 9-240 provides, in part, that "[e]xcept as in this Act otherwise provided, no public utility shall charge, demand, collect or receive a greater or less or different compensation for any product, or commodity furnished or to be furnished, or for any service rendered or to be rendered, than the rates or other charges applicable to such product or commodity or service as specified in its schedules on file and in effect at the time * * *." (220 ILCS 5/9-240 (West 1992).) Similarly, section 9-243 states, in part, "[n]o public utility * * * shall directly or indirectly, by any device or means whatsoever, suffer or permit any corporation or person to obtain any service, commodity, or product at less than the rate or other charge then established and in force as shown by the schedules filed and in effect at the time." 220 ILCS 5/9-243 (West 1992).
In essence, sections 9-240 and 9-243 provide a guarantee that a regulated entity will not charge rates, or provide services at rates, different from those reflected in the schedules on file with the Commission and in effect at the time. In this case, however, we have held among other things that Rate CS contains no rates or charges. Because there is no schedule properly on file with the Commission, any attempt by Edison to set rates pursuant to Rate CS, in futuro, would violate sections 9-240 and 9-243 of the Act.
Similarly, section 9-201 precludes a utility from changing any of its rates without 45 days' prior notice to the Commission and the public. (220 ILCS 5/9-201 (West 1992).) This section provides in pertinent part:
"[u]nless the Commission otherwise orders, * * * no change shall be made by any public utility in any rate or other charge or classification, or in any rule, regulation, practice or contract relating to or affecting any rate or other charge, classification or service, * * * except after 45 days' notice to the Commission and to the public as herein provided. Such notice shall be given by filing with the Commission and keeping open for public inspection new schedules or supplements stating plainly the change or changes to be made in the schedule or schedules then in force, and the time when the change or changes will go into effect * * *. The Commission, for good cause shown, may allow changes without requiring the 45 days' notice herein provided for, by an order specifying the changes so to be made and the time when they shall take effect and the manner in which they shall be filed and published." 220 ILCS 5/9-201 (West 1992).
It is apparent that, if approved, Rate CS would permit Edison to change the rates of certain Rate 6L customers pursuant to a negotiated contract without the requisite 45 days' prior notice. Since this would violate section 5/9-201, the Commission once again erred in approving Rate CS.

V
In exercising our obligation of appellate review, we wish to point out that we have not reached our decision without due regard for the significant obstacles impacting upon today's regulatory process. Indeed, we fully appreciate the ever increasing changes affecting public utilities, such as expanded competition, escalating fuel costs and greater environmental controls. All of these factors and more have, no doubt, caused unanticipated difficulties for both the utilities and their regulators. Without question, utilities have the unenviable task of establishing rates *971 which, at least potentially, are viewed by the public as not only unpopular but also excessive.
Nevertheless, we are equally aware of the special rights and obligations arising from the regulatory compact between the public and investor owned utilities. As part of that compact, utilities must comply with the requirements of the Act and subject themselves to certain constraints, including the filing and publication of rates. Concomitantly, the Commission, as the legislatively appointed guardian of the public's interest, must carry out its statutory mission to approve of only those rates which fully comport with these requirements. Otherwise, the regulatory world is turned on its head, as in this case, where the regulated has in effect become the regulator.

VI
Finally, Edison and Illinois Power Company, intervenor, have filed separate petitions for rehearing. Edison argues that this court has (i) ignored longstanding precedent which recognizes the Commission's broad discretion with respect to rate regulation, (ii) overlooked legislative acquiescence supporting the Commission's order, and (iii) tolerated harsh and unjust results. Illinois Power Company, on the other hand, submits that this court has failed to mention relevant portions of sections 9-102 and 9-201 of the Public Utilities Act. The petitions are denied for the following reasons.
Contrary to Edison's impression of our opinion, this court fully acknowledges the Commission's broad discretion in setting utility rates (see in toto section III of the preceding opinion, slip op. at pages 19-20), but finds that such discretion is largely irrelevant in determining whether a particular rate has or has not been filed and published in accordance with the requirements of the Public Utilities Act.
We also find that legislative acquiescence in connection with other similar tariffs approved by the Commission does not bar judicial review of the issues in this case. In People ex rel. Watson v. House of Vision (1974), 59 Ill.2d 508, 514-15, 322 N.E.2d 15, cited by Edison, the Illinois Supreme Court noted that a "reasonable construction of an ambiguous statute by the governmental officers or departments charged with its enforcement, if contemporaneous, consistent, long-continued, and in concurrence with legislative acquiescence, creates a presumption of correctness which is only slightly less persuasive than a judicial construction of the same act." (Emphasis added).
However, in this case, we find nothing reasonable about the Commission's construction of the statutes at issue. Nor do we believe the statutes are ambiguous. As the Illinois Supreme Court has explained on several occasions, "It is undeniable that weight should be given a contemporaneous construction placed on an ambiguous statute by the officers charged with the duty of administering it. We do not believe the statute is ambiguous. Even if ambiguity is assumed, the rule obviously cannot be invoked to prevent these officers from rectifying an erroneous construction. An administrative construction of a statute is not binding if it is erroneous." Illinois Power Co. v. Mahin (1978), 72 Ill.2d 189, 195, 21 Ill.Dec. 144, 381 N.E.2d 222, quoting Martin Oil Service, Inc. v. Department of Revenue (1971), 49 Ill.2d 260, 269, 273 N.E.2d 823.
More important, the courts' refusal to apply the doctrine of legislative acquiescence in the face of an agency's erroneous construction of a statute is as well established as the doctrine itself. See e.g., National Automobile Underwriters Assoc. v. Director of Insurance of State of Illinois (1953), 348 Ill.App. 554, 565, 109 N.E.2d 630 (rejecting a twelve year acquiescence on the basis that "an erroneous construction of a statute by an administrative agency is not binding on the courts"); and Superior Coal Co. v. Department of Revenue (1954), 4 Ill.2d 459, 467-68, 123 N.E.2d 713 (declining to enforce an agency's longstanding but erroneous interpretation of a statute).
Edison lastly posits that our resolution of the issues in this case countenances harsh and unjust results. However, as we noted in our opinion, we must construe the Public Utilities Act as written regardless of *972 the desirability of the results. (Buckellew v. Board of Education of Georgetown-Ridge Farm Community Unit School District No. 4 (1991), 215 Ill.App.3d 506, 511, 159 Ill.Dec. 58, 575 N.E.2d 556, appeal denied, 142 Ill.2d 652, 164 Ill.Dec. 915, 584 N.E.2d 127). Moreover, we find that under the circumstances of this case, the need for Edison to compete more effectively with other energy providers simply does not justify the Commission's approval of an order permitting Edison to avoid the requirements of the Act.
Finally, we summarily reject Illinois Power Company's suggestion that we failed to mention other portions of sections 9-102 and 9-201. These other portions are irrelevant.
Accordingly, the petitions for rehearing filed on behalf of Commonwealth Edison and Illinois Power Company are denied.
For the foregoing reasons, we reverse the Commission's order approving Rate CS.
Reversed.
COUSINS, P.J., and McNULTY, J., concur.
NOTES
[1] In light of our disposition of this appeal on the foregoing bases, we find it unnecessary to provide an exhaustive review of the entire record. We present the following condensed recitation of what is a large and sometimes burdensome record, replete with technical analysis, merely to assist the reader in understanding the dispositive issues in the case.
[2] Uneconomic bypass occurs where a customer leaves the system for another utility, either gas or electric, and the cost of the alternative service is greater than the original provider's marginal cost, i.e., the cost of providing service to a particular customer above and beyond the fixed costs of operation. See also Central Illinois Light Company, Proposed Rate 32, Electric Contract Service (Dec. 22, 1992), I.C.C. Docket # R-18830 (uneconomic bypass occurs when "the cost of installing an operating cogeneration facility is higher than the price of the utility's marginal cost of providing service to the customer.").
[3] Edison uses the terms incremental costs and marginal costs interchangeably. (For a definition of marginal costs, see note 2, supra.) Fixed costs differ from marginal costs in that the former generally do not vary with changes in operation, whereas the latter include additional costs associated with providing service to a specific customer.
[4] None of these other parties appealed the Commission's order.
[5] We note that most of the testimony in the record appears via "pre-filed" statements analogous to written interrogatories.
[6] Juracek defined short run marginal costs as the immediate costs associated with a small increment in load, in a period too short to adjust capacity. Long run marginal costs, on the other hand, are calculated under the assumption that the increase in load will continue indefinitely.
[7] John V. Stutsman, Director for the Integrated Resource Planning Program, also attested to the benefits garnered by having Rate CS customers remain within the system.
[8] Edison and the Commission concede, however, that approval of these other tariffs has never been the subject of appellate review.
[9] The Commission defined existing load as the customer's demand for the calendar year preceding the effective date of the contract.
[10] "Rates" are defined as "every individual or joint rate, fare, toll, charge, rental or other compensation of any public utility or any two or more such individual or joint rates, fares, tolls, charges, rental or other compensation of any public utility or any schedule or tariff thereof, and any rule, regulation, charge, practice or contract relating thereto." 220 ILCS 5/3-116 (West 1992).
[11] The Act elsewhere provides that "[n]o public utility shall undertake to perform any service or to furnish any product or commodity unless or until the rates and other charges and classifications, rules and regulations relating thereto, applicable to such service, product or commodity, have been filed and published in accordance with the provisions of this Act * * *." 220 ILCS 5/9-104 (West 1992).
[12] Juracek herself explained that "[t]he costs we are proposing to analyze are the variable or out of pocket costs of serving the load of Rate CS customers" and "[r]evenues from Rate CS customers should be sufficient to recover these out of pocket costs, and make some contribution towards the recovery of fixed costs."